## CHEESMAN *et al. v.* SHREEVE *et al.*

### *(Circuit Court, D. Colorado.* December 26, 1889.)

1. MINES AND MINING—LOCATION—DISCOVERY.
   It is requisite to a valid location and to the ownership of the title to a valid lode mining claim, that there should be a discovery of ore, gold or silver bearing mineral in rock in place, showing a well-defined crevice, a discovery at least 10 feet deep from the lowest rim rock thereof, which discovery of mineral must be at the point claimed and designated, or made the point of discovery by the locators of said claim, and so designated in the location certificate relied upon by them in the making of said location.

2. SAME—LOCATION STAKES.
   A location stake must be erected at the discovery of said claim, with a plain sign or notice thereon, containing the name of the lode, the name of the locator, and the date of the discovery.

3. SAME—MARKED BOUNDARY ON SURFACE.
   The claim must have its boundaries so marked upon the surface as to be easily traced by means of six substantial stakes, one set at each corner of said claim, one at the center of each side line thereof; which said stakes shall be of substantial character, and sunk in the ground, hewed on the two sides of the corner stakes which are in towards the claim, and the side stakes hewed on the side which is in towards the claim.

4. SAME—LOCATION CERTIFICATE.
   There must be made and filed by the locators of said claim a location certificate which shall contain the names of the locators, the date of the location, and such a description of the claim by reference to some natural object or permanent monument as will identify the claim; also, the number of feet in length claimed on each side of the center of the discovery shaft, and the general course of the lode.

5. SAME—ACTION FOR TRESPASS—JOINDER OF CLAIMS.
   In a suit for trespass, defendants cannot, after suit brought, unite several claims, each having a portion of the outcrop, for the purpose of asserting the right to follow a vein upon its dip, when said right does not exist within the said claims, considered separately.

6. SAME—ABANDONMENT AND RELOCATION.
   If ground once included within the location of a lode mining claim be abandoned, and a new location made thereon, as abandoned ground, said location dates only from the relocation thereof as abandoned ground, and does not relate back to or obtain any rights on account of the location which has been abandoned.

7. SAME—VEIN OR LODE.
   A vein or lode is a body of mineral or of mineralized rock in place, within defined boundaries, in the general mass of the mountain.

8. SAME.
   Ore disseminated at intervals, or found in channels, chutes, cavities, pockets, or other irregular occurrences at intervals in quartzite, without ore connections between the same, is not a lode, ledge, or vein, within the meaning of Rev. St. U. S. § 2322, allowing the owner thereof to follow the same beyond his side lines upon its dip.

9. SAME—CONTINUITY OF VEIN.
   The vein must be continuous only in the sense that it can be traced by the miner through the surrounding rocks. Slight interruptions of the mineral-bearing rock

are not alone sufficient to destroy the identity of the vein; nor would a short partial closure of the fissure have the effect to destroy the continuity of the vein, if, a little further on, it appeared or recurred again, with mineral-bearing rock in it.

10. SAME.

Where both mineral and fissure close, come to an end, and are not found again in that direction, or, if found at all, are so far off from the tracing of the vein, or so diverted from its original trend or line, or appear under different geological conditions and surroundings, the jury would be warranted in finding that the continuity was broken, and that the lode, therefore, was not the same.

11. SAME—END LINES.

End lines as designated in the location certificate are not necessarily, in law, the end lines, unless they actually cross the actual outcrop of the vein.

12. SAME—TRESPASS—MEASURE OF DAMAGES.

The measure of damages in an action for trespass upon a mining location is the value of the ore taken by the defendants from within the side lines of plaintiffs' claim prior to the institution of suit.

13. SAME.

If the jury should believe from the evidence that defendants, after they had knowledge that plaintiffs contested their right to mine within the side lines of plaintiffs' claim, thereafter mingled the ore taken from within plaintiffs' side lines with other ore, with the purpose of preventing or obstructing the ascertainment of its quantity and value, or in willful disregard of plaintiffs' rights, they would be warranted in construing such conduct against defendants in determining the damages.

14. SAME.

If, on the other hand, they believed that defendants, in the honest belief that they were of right pursuing their vein of ore, and without any design to cover up the quantity or value of ore taken, and in the usual mode of handling and marketing such ore, they suffered it to mingle with other ore, or failed to keep it segregated, then they should ascertain the approximate value of the ore, as best they could, from all the facts before them.

At Law.   Action of ejectment.

*C. J. Hughes, Jr.*, for plaintiffs.

*B. F. Montgomery* and *C. C. Parsons*, for defendants.

PHILIPS, J., (*charging jury.*)   Gentlemen of the **jury:**   Before proceeding to give you the charge I have prepared, I will give you certain declarations of law, asked for by the plaintiffs, as not inapplicable to the consideration of this case:

"The court, at the instance of the plaintiffs, charges the jury that their verdict must be for the plaintiffs, unless the defendants fully establish, by a preponderance of the evidence, the following facts,—that is to say, that they are the owners of a lode mining claim located and held in compliance with the statutes of the United States and the state of Colorado, permitting and governing the location of gold mining claims; that, among the requisites to a valid location and to the ownership of the title to a valid lode mining claim, are the following: *First.* That there should be a discovery of ore, gold or silver bearing mineral in rock in place, showing a well-defined crevice, a discovery at least ten feet deep from the lowest rim rock thereof; which discovery of mineral must be at the point claimed and designated, or made the point of discovery by the locators of said claim, and so designated in the location certificate relied upon by them in the making of said location. *Second.* The erection of a location stake at the discovery of said claim, with a plain sign or notice thereon, containing the name of the lode, the name of the locator, and the date of the discovery.   *Third.* That said claim must have its boundaries so marked upon the surface as to be easily traced by means of six substantial stakes,—one set at each corner of said claim, one at the center of each side line thereof,—which said stakes shall be of substantial character, and sunk in the ground, hewed on the two sides of the corner stakes which are in towards the claim, and the side stakes hewed on the side which is in towards

the claim. *Fourth.* That there shall be made and filed by the locators of said claim a location certificate, which shall contain the names of the locators, the date of the location, and such a description of the claim by reference to some natural object or permanent monument as will identify the claim; also, the number of feet in length claimed on each side of the center of the discovery shaft, and the general course of the lode; it being provided by law that any location certificate of a lode claim which shall not contain the name of the lode, the name of the locator, the date of location, the number of linear feet claimed on each side of the discovery shaft, the general course of the lode, and such description as shall identify the claim with reasonable certainty, shall be void.

"The court further charges the jury, at the instance of the plaintiffs, that the defendants cannot unite several claims, each having a portion of the outcrop, for the purpose of asserting the right to follow a vein upon its dip, when said right does not exist within the said claims, considered separately: provided such union of claims was made after suit brought; and therefore this does not apply to the union of the old Champion and Nevada claims.

"The court, at the instance of the plaintiffs, further charges the jury that, if ground once included within the location of a lode mining claim be abandoned, and a new location made thereon, as abandoned ground, said location dates only from the relocation thereof as abandoned ground, and does not relate back to or obtain any rights on account of the location which has been abandoned, and that the law makes a distinction between a relocation and an amended location certificate, although both may be designated as amendments in such location certificates.

"The court further charges the jury, at the instance of the plaintiffs, that, in addition to establishing by preponderance of testimony that they are the owners of the Champion, Widow McCree, and Peerless lode mining claims, and that the same are located and are situated with reference to the outcrop at the surface claimed by the defendants as to their side lines and end lines, and of their discoveries as hereinbefore charged, they must prove and establish to your satisfaction, by a clear preponderance of testimony, the further fact that there outcrops, within said claims as hereinbefore stated, a vein, lode, or ledge, within the meaning of the law, descending upon its dip continuously, on ore of appreciable value in gold and silver, to the ground in controversy; and that the ore from within the Battle Mountain and Little Chicago lode mining claims is a part and portion of such a lode or ledge, and not of an ore deposit or body having its source or origin higher up, within the boundaries of the Battle Mountain or Little Chicago lode mining claims, than where it was found. That, in order to the existence of such a vein, there must be proved, by a preponderance of testimony, to exist, a lode, ledge, or vein, within the meaning and purview of the statute, having lateral extent as well as extent upon its dip, and being a continuous mass of mineral, between defined boundaries, in the solid mass of the mountain, extending continuously upon its dip to the ground in controversy; and that the existence of detached or small bodies of ore upon one line, or upon or within a given stratum of rock, unless the remainder of said stratum contains the elements which constitute a vein, to-wit, defined walls and crevice, continuous ore, and mineralization of an appreciable value, throughout its extent, the same is not, within the statute, such a lode, ledge, or vein as entitles the owner thereof to follow the same beyond his side lines upon its dip.

"The court further, at the instance of the plaintiffs, charges the jury that ore disseminated at intervals, or found in channels, chutes, cavities, pockets, or other irregular occurrences at intervals in quartzite, without ore connections between the same, is not a lode, ledge, or vein, within the meaning of the statute.

"The court further charges the jury, at the instance of the plaintiffs, that end lines, as designated in the location certificate, are not necessarily, in law, the end lines, unless they actually cross the actual outcrop of the vein."

Now, gentlemen of the jury, the plaintiffs have shown title, by patent from the United States and mesne conveyances, to the mining claims known in this trial as the "Battle Mountain and Little Chicago." By the terms of the grant under the patent, the right of possession and ownership are vested in the grantee, not only to the surface of the ground contained within the exterior lines of such surveys, but to everything beneath, within the planes lying within lines drawn downward, vertically, between such surface boundary lines. The plaintiffs have made out a *prima facie* case to recover in ejectment by proof of title through patent and subsequent conveyances to them; the answer of defendants admitting that they had, in excavating, penetrated beneath the surface location of the Battle Mountain survey. While this is so respecting the operation of the patent, the statute law of the United States (section 2322) makes this important provision respecting the rights of a locator who may not have received a patent:

"The locators of all mining locations heretofore made, or which shall hereafter be made, on any mineral vein, lode, or ledge, situated on the public domain, their heirs and assigns, where no adverse claim exists on the 10th day of May, 1872, so long as they comply with the laws of the United States and with state, territorial, and local regulations not in conflict with the laws of the United States, governing their possessory title, shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes, and ledges throughout their entire depth, the top or apex of which lies inside of such surface lines, extended downward, vertically, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downward as to extend outside of the vertical side lines of such surface locations."

This right of the locator has its root in the same statute that gives patentee his patent; so that, if the defendants have brought themselves within the provisions of this statute, and they reached the point of the alleged trespass by pursuing and excavating a vein of ore which had its outcrop or apex within the side lines of their location, and their location was conformable to law respecting this vein, they are not guilty of the alleged trespass. The evidence on the part of the defendants tends to show that the discovery on the Champion claim, in its original form, and the location were made in 1880, and that in 1882 a relocation of this claim was made, and in 1886 an amended location thereof was made by defendants, enlarging its extent. The evidence also tends to show that the Widow McCree claim was discovered and located in 1885, and that the title of said locators has passed, by mesne conveyances, to the defendants, or some of the parties who are operating the mine as partners. The Widow McCree claim, as located, extended north, so as to include a part of what appears on one of the maps as the "Belle of the East Claim." The locators, or those holding under them, had the right, by the local statutes of Colorado, to alter or amend the original location at any time up to the institution of this suit, and such amendments or

relocations, when made, had relation back to the time of the original location; and these plaintiffs are in no position, in this controversy, to question such amendments or relocations. And, while it is true that, in order to authorize the location of these claims, the locator should have made a discovery thereon of a vein of mineral ore, and done certain work thereon, and complied otherwise with the law regulating such locations, yet you are instructed that the certificates of location are presumptive evidence of such discovery; and that the locators had complied with the law in this respect; and that, after the lapse of many years, as in this case, every reasonable presumption should be indulged by the jury in favor of the integrity of the location; and that where, as in the case of some of these claims, the original locators reaffirmed, under oath, on the witness stand, that at the point of their workings named in their location entry they did discover such vein, then, when the plaintiffs come here, after the lapse of so many years, and undertake to show; by witnesses sent to these old openings, with their accumulated *debris,* to obtain evidence by inspection that no vein was in fact found by the original locators, such attack should be sustained by evidence so clear and persuasive as to fully satisfy your minds that such claimed discoveries were in fact false. And you are further instructed, in this connection, that, if you believe from the evidence that such locators did make such discoveries of an ore vein, the defendants, in further and later openings of such mine, would not be confined to the point where such original openings or workings were made, because, by the express terms of the federal statute, (section 2322,) such locators "shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes, and ledges throughout their entire depth, the top or apex of which lies inside of such surface lines extended downward, vertically, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side lines of such surface locations."

If you find and believe from the evidence that, since defendants took possession of the several claims in what is called the "Champion Group" as far back as 1886, under the title-deeds in evidence, they have held and treated them as an entirety,—as one property,—and prosecuted the extent of work shown in evidence as a system of development of the whole, then said several claims may be regarded as one, for the purposes of this case, and the work prosecuted by the defendants thereon as having been done for the whole. To justify the subversion by the defendants of the territory underlying the plaintiffs' surface location, it devolves upon them to show by evidence that a vein, lode, or ledge of mineral ore had its outcrop or apex inside of the surface lines of their location, and that they so reached the point of the alleged trespass by pursuing such vein from its outcrop or apex. The statute of the United States also requires that the end lines of the claims should be parallel with each other, and, in asserting a right to follow the vein on its dip without the side lines of their location, and into plaintiffs' location, defendants must show the outcrop or apex of such vein or lode to be in their own location

throughout the ground in controversy, being the extent of the locations of defendants and plaintiffs parallel to each other.

If you find, from the evidence before you, that the end lines of the defendants' claim are substantially parallel with each other, that will meet the requirements of the law in respect to such parallelism; and, in considering this issue, you will disregard the fact that the south end of the Champion claim extends beyond, or is intercepted by, the Pacific survey; and you will also disregard the fact that the north end of the Widow McCree claim, in a contest with the Belle of the East claim, may have been adjudged by the court in favor of the latter, if you should further find the fact to be that subsequently, in 1888, and prior to the alleged trespass, the said Belle of the East quitclaimed back to defendants said interest, and that defendants have continually since, as theretofore, without any interruption of their possession, held and claimed the same as one entire claim, as formerly located, and that the workings performed and prosecuted by them on the so-called claims were done in development of their group of claims as an entirety. The statute further provides that the right of such locators of possession to such outside parts of such vein shall be confined to such portions thereof as lie between vertical planes drawn downward, through the end lines of their locations, so continued in their own direction that such planes will intersect such exterior parts of such vein.

If you are satisfied, from the evidence before you, that such end lines of the defendants' claims are substantially parallel, as heretofore defined, and that the point where the excavation was made by defendants within the side lines of the Battle Mountain claim was substantially within the planes of the end lines of the defendants' claims, drawn vertically downward, and continued in their own direction, you will then be brought to the more important controversy here, as to whether or not there was a vein or lode of mineral ore having its apex or outcrop inside of the side lines of the Champion claim, in pursuing and excavating which the defendants or their lessees penetrated within the side lines of the Battle Mountain location; and, for the purposes of this case, the west end line of the Battle Mountain claim is to be regarded as such side line. If the defendants did reach the point in question by so following up such vein, they are not guilty of the alleged trespass.

It is difficult, gentlemen of the jury, for the court to define and lay down in so many words the exact meaning of the terms "vein," "lode," or "ledge," which are employed in the statute interchangeably. It is questionable, to my mind, whether the term is susceptible of an arbitrary definition, or whether one in set phrase should be given so unvarying as to apply to every case, regardless of the differing conditions of locality and mineral deposit. The philologist would, in general terms, define a vein to be "a seam or layer of any substance more or less wide, intersecting the rock or stratum, and not corresponding with the stratification, and is often limited, in the language of miners, to such a layer or course of metal or ore." In the judgment of geologists, a fissure in the earth's crust, and openings in its rocks and *strata* made by some

force of nature, in which the mineral is deposited, is regarded as important, if not essential; "but," as has been said by an eminent judge, "to the practical miner, the fissure and its walls are only of importance as indicating the boundaries within which he may look for, and reasonably expect to find, the ore he seeks. A continuous body of mineralized rock, lying within any other well-defined boundaries on the earth's surface, and under it, would equally constitute, in his eyes, a lode. We are of the opinion, therefore, that the term, as used in the acts of congress, is applicable to any zone or belt of mineralized rock lying within boundaries clearly separating it from the neighboring rock." (*Eureka Case*, 4 Sawy. 311.)

As applied to the case on trial, I may, perhaps, safely give you in charge, in its essential substance, the general definition and rules which have been approved in this jurisdiction, and affirmed by the highest authority in our country, the supreme court of the United States. In general, it may be said that a vein or lode is a body of mineral or of mineralized rock in place, within defined boundaries, in the general mass of the mountain. The vein which the miner pursues from its outcrop must, of course, be the same which he pursues outside of his side lines. Such vein need not, however, be a straight line, of uniform dip or thickness, or richness of mineral matter, throughout its course and length. Generally speaking, veins are found, when the mineral is extracted, in what constitutes clefts or fissures in surrounding walls, with a well-defined or traceable hanging wall, or roof above and foot-wall below, of different kinds of rock. So long as the inclosing walls can be continually traced, and like mineral matter found therein, no doubt can exist that it is the same vein; but sometimes these clefts diminish so as to be scarcely perceptible, and, again, for a short distance, these fissures disappear to the eye and touch of the explorer, and then, a little further on, on the same plane, they are found again; and there may be spots or short spaces where the overhanging wall and the under-floor rock exist while the mineral deposit is not present, but on following the fissure or trend it reappears very soon. The jury will be sufficiently guided in such instances by keeping in mind that the vein or lode must be continuous only in the sense that it can be traced by the miner through the surrounding rocks; that is, slight interruptions of the mineral-bearing rock are not alone sufficient to destroy the identity of a vein; nor would a short, partial closure of the fissure have the effect to destroy the continuity of a vein, if, a little further on, it appeared or recurred again, with mineral-bearing rock in it.

Where both mineral and fissure close, come to an end, and are not found again in that direction, or, if found at all, are so far off from the tracing of the vein, or so diverted from its original trend or line, or appear under different geological conditions and surroundings, the jury would be warranted in finding that the continuity was broken, and that the lode, therefore, was not the same; but, where well-defined boundaries, characterized by a generally uniform hanging wall and floor, and extending on a like general plane or dip, exist, slight evidence of ore

may establish the existence of a lode. Such characteristic boundaries "constitute a fissure, and, if in such fissure ore is found, although at considerable intervals, and in small quantities, it is a lode or vein, within the meaning of the law." It is claimed, for instance, on the one side, that, while on the plane or line where the Champion tunnels run there may be found mineral matter permeating more or less the rock formation, and that here and there ore deposits more or less valuable may have been found, yet that such deposits of ore were only found in vugs, or, as some of the witnesses term it, "bugs," in small quantities, lying in no general direction, widely separated, and found in the excavations only after driving the tunnel for considerable distances through hard quartzite rock; and that these vugs of ore lay in detached cavities, more or less like a trough, wholly surrounded by or enveloped in such quartzite rock. If you should conclude that this was the fact respecting the condition and character of the Champion workings, then there would, in contemplation of law, be no vein of mineral ore there. A "vug" is defined by Webster to be "a cavity in a lode or vein," which would imply that such cavities were in veins; but such technical definition of the term must yield to the sense in which the witnesses employed it, and defined it, on the stand. If, on the other hand, you should find and believe from the evidence that the ore deposits were traced from the outcrop, and were deposits of like ore in cavities lying or running in a general direction or dip into the mountain, on a plane more or less uniform, and found to constitute a net-work of ore closely adjacent and near to, and often running into, each other, and within a general wall above and below, even though here and there separated in their course by quartzite rock containing like mineral matter for only short distances, this of itself would not necessarily break the continuity of the lode, as heretofore defined. In this connection, gentlemen, I appropriate part of a charge given by Judge HALLETT in *Hyman* v. *Wheeler*, 29 Fed. Rep. 353, which is as follows:

"In the books, and among miners, veins and lodes are invested with many characteristics,—as that they lie in fissures or other openings in the country rock; that they contain materials differing, or in some respects corresponding, with the country rock; that they are of tabular form, and of a banded structure; that some one or several things are commonly associated with the valuable ores; that they have selvages and slickensides in the fissures and openings, and the like. It is not necessary to enumerate all the features by which they are known. Some of these characteristics are said to be common to all lodes and veins, and others of rare occurrence; but, in general, witnesses will take up one or more of them as essential features of a lode or vein, and declare the fact upon the presence or absence of such elements. A party seeking to prove the existence of a lode or vein will naturally rely on any such characteristic that he can find in the ground in dispute, and call witnesses who will accept that feature as establishing the fact. The party opposed will seek to disprove the proposition advanced against him, and, in addition, to show that all other characteristics of a lode or vein are, in the case under consideration, entirely wanting. In this way, a fierce conflict of testimony is waged as to the existence of one or another distinguishing feature of a lode or vein, and the jury is asked to return a verdict upon the issue thus made. It is apparent, how-

ever, that, upon any issue touching the existence of a lode or vein in a place designated, a question whether it has one characteristic or another is a part only of the main question, and, in the presence of other unquestioned elements establishing the existence of a lode or vein, an issue of that kind becomes immaterial. To illustrate that matter, it may be said that, with ore in mass and position in the body of a mountain, no other fact is required to prove the existence of a lode of the dimensions of the ore. As far as it prevails, the ore is a lode, whatever its form or structure may be; and it is not at all necessary to decide any question of fissures, contacts, selvages, slickensides, or other marks of distinction, in order to establish its character. As was said in another case in this court: 'A body of mineral or mineral-bearing rock, in the general mass of the mountain, so far as it may continue unbroken and without interruption, may be regarded as a lode, whatever the boundaries may be. In the existence of such body, and to the extent of it, boundaries are implied.' * * * Whether it is in the form of a broken mass of blue and brown lime, between regular walls of the same rocks, or a part of such *strata* in solid formation, mineralized by replacement of some of their constituents with valuable metals, the result is the same, and the name which science may apply to it is of no importance. An impregnation, to the extent to which it may be traced as a body of ore, is as fully within the broad terms of the act of congress as any other form of deposit. In discussions at the bar, and in the opinions of witnesses, it was assumed that the character of a body of ore, as coming within or falling without the act of congress, could be determined by classifying it as a segregated or contact fissure vein, or as a bed or impregnation of ore; and that it was a matter of importance to ascertain whether the ore was separated from the country rock by planes or *strata* of that rock visible to the eye. I see no reason for such distinctions. It is true that a lode must have boundaries, but there seems to be no reason for saying that they must be such as can be seen. There may be other means of determining their existence and continuance, as by assay and analysis; and, certainly, the form and mode of occurrence of valuable ore, however controlling and influential in determining its geological character, is not a matter upon which it can be excluded from the terms of the act of congress."

There has been a great variety of evidence introduced, bearing more or less upon this issue, taking a wide range in developing, grouping together, and presenting before you numerous facts designed to aid you in forming an intelligent conclusion. Some of these facts and incidents are quite remote or collateral, and some of them are almost impalpable and intangible to the common sense. The topography of the mountain, its geological formation, with its sands, its limes, its porphyry, its quartzite and granite formations, together with the mineralized rock in body and detachment, with photographs of the mountain itself, and of the tunnels and surveys, maps and drawings, have been detailed and laid before you, for your assistance and consideration. All these, both in detail and collectively, bear more or less upon the main issue. They are designed to bring before your view, as far as possible, in the court-room, the organism of that mountain side, and the inside workings of the mine, to enable you, from your own observation somewhat, to judge of the rock formations of that locality, the stratification of the rocks, and the reasonableness, or otherwise, of the presence and direction of mineral substances and deposits on certain contacts of *strata*, and the likelihood or not of a vein or lode of ore being found and extending among such

formations. The expert witnesses for both parties are agreed, in the main, that certain geological formations and *strata*, and substances and fissures, are the usual concomitants and incidents of the presence of the ore vein. So, in tracing out the lay and trend of such ore deposits, the presence or absence of such concomitants is important for the attention of the miner, as they are for the jury in trying this issue.

Gentlemen, it would be an impossible task for the court or you to undertake to reconcile and harmonize the varying statements of all the witnesses who have testified in this case. Such diverse and positively contradictory statements respecting many palpable, tangible facts, susceptible of direct proof, I have not observed, in a long experience in court. Some of the witnesses, unquestionably, have not told the truth; and it is for you to conclude who they are, and whom you will believe. Judging from this trial, there must be something in the altitude of that mountain, or the depths of its mines, wonderfully prolific of falsifiers and orators. From the men of science, versed in geology, mineralogy, and mining engineering, to the most unlettered miner who dwells in the bowels of the mountain, many of them seem to be orators; and, immediately after taking the witness stand, they would be found on the platform, on the same plane as the judge, making a speech to the jury, with all the warmth, energy, and zeal of hired advocates. Some of them were simply partisans, and seemed to have forgotten the office which the law and the obligation of their oath imposed upon them, to speak to the truth of their knowledge, and to tell nothing but the truth. Such exhibitions are to be deplored. They tend to break down the popular respect for the solemnity, dignity, and justice of judicial trials; and, where they obtain, trials are likely to become a mockery, and justice a failure. It will be found, however, gentlemen, in this case, as in the vast majority of trials, that the prominent, controlling facts in the great mass of testimony lie within a small compass. These more conspicuous facts, and a few well-recognized principles, that score to the line of common experience and common sense, you may safely follow as your guide; never for one moment allowing yourselves, in your deliberations, to lose sight of them. This case should, as far as practicable, be stripped of all extraneous matters and mere collateral issues and incidents here and there brought into it, and decided upon the actual facts, as shown by the weight of evidence to have existed in the mine in controversy at the time this suit was instituted.

There are some collateral facts, bearing upon the question as to whether or not there exists at the point in question what is termed a "quartzite contact with a vein outcrop," which you might consider, possibly, with some profit, and that is, whether or not miners, in their explorations and excavations in the immediate locality in this mountain side, have, as a rule, worked on what was generally recognized as the "quartzite contact," and whether or not these workings, as a general rule, when pursued on a dip, have developed paying ore, as also the extent to which such workings have been prosecuted, as bearing on the fact whether or not a vein exists on that contact. Likewise, you might consider the character,

the extent, the general direction, and practical results of the workings prosecuted by the defendants and their lessees in the Champion mine; the quantity of paying ore extracted in a comparatively uniform direction and dip, as also whether or not there was any interruption of the so-called vein at the point of connection where the tunnel or excavation passed out of the side line of the Champion into that of the Battle Mountain; and whether or not the ore at this point of connection is materially different in character from what preceded might also be considered by you, as also why it was that defendants, in extending their tunnel or excavations, pursued a comparatively uniform dip, if they did so, in reaching the point of contact with the Battle Mountain claim.

You have before you, also, the testimony of men who actually dug out these tunnels, as to what they found, saw, and handled there. The testimony of such men is by no means unimportant, if it can be credited. One reason why the men who worked out the ore, and those who from time to time saw it worked out, handled it, marketed and assayed it, should have much weight is that, as shown by some of the evidence, while the ore deposited in places may not have been over one or two feet in dimensions, the openings excavated to make an accommodating passway might be three or four feet or more, driven apparently through hard rock, little mineralized, if at all, outside of the ore deposit, so that the mere after-comer would see at such points only the hard, barren walls, from which to draw his conclusion in the main. The opinions of experts, under such conditions, are principally valuable, as being based upon surrounding conditions of rock and substances, as to the reasonableness or probability of the correctness of the statements of the miner as to what he actually found in the way of ore.

You also have before you evidence respecting samples taken from these excavations for your consideration. It is remarkable that there should be such variance in the results of these samples taken, and their assay, as shown by the evidence, on the hypothesis that the men who took them were impartial and honest. With such wide differences, it would indicate that such evidence, at least in this case, is quite unsatisfactory; and it is for you to say, under all the facts and circumstances attending the taking of these samples, as to which of them is more reliable.

There is evidence before you as to the existence of cracks in the overhanging wall, in the Champion workings at certain points; the evident object of such evidence being to create in your mind the probability that the ore deposit found at such points may have come from above, through the lime or porphyry *strata*, and been so deposited where found. In determining whether such be the origin, or whether it be more likely to be a continuation of the vein, as claimed by the defendants, you should take into consideration the condition and character of the ore found at such points, as to whether they bore evidences or not of being oxidized, which is claimed by men of science, experts, to be an inseparable characteristic of ore deposited on this theory of the plaintiffs. In other words, if the ore found at such points as that near to or within the side lines on the Battle Mountain claim, was hard, sulphide ore, as claimed by

defendants, it would be evidence of its formation in place, and, of consequence, more probable that it did not come down, through such crack, from the surface.

If you should find the issues for the plaintiff, it will become necessary for you to assess the amount of damages resulting from the trespass. This is the value of the ore taken by the defendants from within the side lines of the Battle Mountain claim prior to the institution of this litigation. On this issue, you have before you the estimates of plaintiffs' witnesses, ranging from $17,598 to $28,200 and $28,799, while the defendants placed it at from $6,000 to $8,000, gross, subject to a deduction of 40 per cent. for the net result. You must determine, between these extremes, which of them most nearly approximates the true value.

It has been insisted by counsel for plaintiffs that, after defendants had knowledge that plaintiffs contested their right to mine within the side lines of plaintiffs' claim, they should have kept the ore there extracted segregated from other ores, so that its exact measurement and valuation could have been more nearly ascertained, and that their failure to do so should be construed most strongly against them. Of course, gentlemen, if you should believe, from the evidence, that this was so,—that defendants thereafter mingled the ore taken from within plaintiffs' side lines with other ore, with the purpose of preventing or obstructing the ascertainment of its quantity and value, or in willful disregard of plaintiffs' rights,—you would be warranted in construing such conduct against the defendants. If, on the other hand, you should believe that defendants, in the honest belief that they were of right pursuing their vein of ore, and without any design to cover up the quantity or value of ore taken, and in the usual mode of handling and marketing such ore, they suffered it to mingle with other ore, or failed to keep it segregated, and that they have presented here the best evidence obtainable by them, of the result of the ore so excavated and shipped, then you should ascertain the approximate value of the ore as best you can, from all the facts before you bearing upon this issue.

Gentlemen, you are the sole judges of the weight of the evidence and credibility of the witnesses; and, from the close attention you have given to the evidence, and to the arguments of the able counsel engaged herein, I feel such confidence that your intelligence, judgment, and impartiality may so far be relied upon to comprehend, analyze, and properly apply the evidence to the law as to relieve the court from any further review of the evidence.