[Sac. No. 1154.  In Bank.—June 25, 1906.]

# JOHN DAGGETT, and BEN F. DAGGETT, Respondents, v. YREKA MINING AND MILLING COMPANY, Appellant.

MINING CLAIMS—LOCATION OF VEIN.—The validity of the location of quartz mining claims under the Mining Law of May 10, 1872, depends upon a substantial compliance by the locator with the requirements of that act, including the discovery of a vein, the marking of the location so that the surface boundaries can be readily traced, and, if the locator is to acquire any extralateral rights on the dip of the vein, that the end-lines of his location should be parallel.

·NOTICES OF LOCATION—ACT OF CONGRESS—LOCAL LAW.—The act of Congress does not require any posting or recording of notice of location; but it merely permits the enactment of local laws regulating that matter, with the proviso that every notice of location, in order to have any legal effect, must contain required particulars.  In the absence of local law, there is nothing to give any definite legal effect to the posting and recording of notices of location.

ID.—NOTICES AS ACTS IN PAIS — CUSTOMS OF MINERS — ITEM OF EVIDENCE.—Notices of location not required by local law are· of no value except as acts *in pais,* to be considered in connection with the well-known customs and practices of mining prospectors, as an item of evidence upon the question of compliance with the Mining Law in respect to the marking of the surface location so that its boundaries can be readily traced.

ID.—CERTIFIED COPIES OF NOTICES—PROOF OF MARKING OF BOUNDARIES.—Certified· copies from the record of the notices of location, if there is no .law behind them to give them effect, are not competent evidence to prove even that they had been posted on the ground, and are much less competent to prove the actual erection of the monuments therein called for.  The only competent evidence of the marking of boundaries is that of witnesses who saw the monuments placed, or who saw them standing after being placed.

ID.—MAP SHOWING SWINGING LOCATION — DEPARTURE FROM KNOWN DATA.—A map showing a swinging location to include the ground in dispute, which departs from the notices of location and the existing monuments and the croppings of the vein at every point except the point of beginning, and instead of a square location of about fifteen hundred feet in length and six hundred feet in width, as originally intended, makes a lozenge-shaped location, with end-lines seven hundred and twenty feet long instead of six hundred· feet, and side-lines one thousand one hundred and eighty-eight feet long, and thus departs widely from the certain data established by

the best evidence plaintiffs have to offer to prove the orginal location of their claims, cannot be accepted as any evidence of such location.

ID.—READJUSTMENT OF END-LINES TO COURSE AND DIP OF VEIN—INTER-VENING RIGHTS FIXED BY LINE OF MONUMENTS.—Although before a patent and before an adverse right has accrued end-lines may be readjusted to conform to the true course and dip of a vein, yet this can only be done by re-marking the surface location, so that its boundaries may be readily traced. It is the line fixed by the monuments, and not the line indicated by the dip of the vein, that controls in favor of intervening rights.

ID.—OLD CLAIMS—PRESUMPTION—POLICY OF LAW—PRESERVATION AND RESTORATION OF MONUMENTS.—No presumption can be indulged that old claims which have been worked for years, and upon which no sufficient boundary-marks can be found, must have been properly defined by visible monuments, which have been removed and destroyed, either by fraud or by the action of the elements. Such presumption is contrary to the policy of the Mining Law, which requires boundaries to be clearly defined by monuments, to enable subsequent claimants to locate with safety upon the residue by preventing the swinging and floating of earlier locations. To subserve this policy, and as matter of simple justice, the locators are required not only to mark their location when made, but also to use reasonable diligence in preserving and restoring their boundary monuments, as occasion may require.

ID.—OLD MONUMENTS PARTIALLY FOUND—WAIVER OF OBJECTION TO CER-TIFIED COPIES OF NOTICES—EFFECT AS EVIDENCE.—Where portions of the old monuments are found upon the ground, and objection to the admission of certified copies of the notices of location was waived, they must be treated as evidence in the case, so far as they tend to prove, together with the remaining monuments on the ground, that the boundaries were properly marked at the time of location. In this view they are to be considered as determining at most what they state; and where they establish parallel end-lines which do not include the ground in dispute, they must be given that effect.

ID.—VERDICT UNSUSTAINED BY EVIDENCE—END-LINES NOT SHOWN TO BE PARALLEL.—Where there was no evidence to show that the location of the end-lines included the disputed ground, or that the end-lines including it were located as parallel, the verdict in favor of the plaintiff for nominal damages was entirely unsupported by the evidence, and cannot be permitted to stand.

ID.—EVIDENCE OF TRESPASS—PLEADING.—Though the evidence of the trespass was not precluded by the fact that the complaint did not aver a trespass on the dip of the vein, where the defendant was not misled by a general averment of trespass upon plaintiffs' premises, yet where the complaint alleged a trespass upon premises described which did not include the disputed ground, objection thereto should

have been sustained on that ground, if urged, but not having been
urged, it might have been obviated by amendment.

ID.—SPECIFIC AVERMENTS IN TRESPASS—Though it is not strictly neces-
sary in an action of trespass on plaintiffs' mining claim to allege
that the mining was done on the dip of a vein having its apex
in such claim, and that the end-lines were parallel, it is better to
allege the facts specifically, to present the issues more definitely
and prevent surprise.

ID.—EVIDENCE OF IDENTITY OF VEIN — BURDEN OF PROOF—SUPPORT OF
FINDING.—The burden was upon plaintiffs to establish the identity
of the vein trespassed upon with that having its apex in plaintiffs'
claim, but in establishing it they were not required to trace or
open the workings. *Held,* that the burden of proof was sufficiently
supported to sustain a finding as to the identity of the vein.

APPEAL from a judgment of the Superior Court of Siski-
you County and from an order denying a new trial.  J. S.
Beard, Judge.

The facts are stated in the opinion of the court.

O'Neill & Butler, and R. S. Taylor, for Appellant.

Gillis & Tapscott, for Respondents.

BEATTY, C. J.—This is an action to recover damages for
alleged trespass consisting in the extraction and removal of
gold-bearing ore from mining ground claimed by the plaintiffs.

The material allegations of the complaint are that the plain-
tiffs for twenty years last past have been the owners, and,
save for the interruptions alleged, have been in possession of
two certain quartz mines in Siskiyou County, known as the
"Evening Star Quartz Mine" and the "Central Quartz Mine,"
more particularly described as follows:—

"That certain mine known as the Evening Star Quartz
Mine, situated on the head waters of Eddy's Gulch, county
and state aforesaid, commencing at a double top fir tree blazed
Evening Star, and on the N. W. corner of the claim, thence
in an N. E. direction fifteen hundred feet, more or less, to a
pillar of rock marked 'E. V.' thence S. E. direction six hun-
dred feet to a monument of stones and stake marked 'E. V.'
thence in a S. W. direction fifteen hundred feet to a monu-
ment of stake and stones, stake marked 'E. V.,' thence in a
N. W. direction six hundred feet to the place of beginning.

The location notice of which said mining claim was dated on January 1st, A. D. 1884, and filed for record on the 8th day of January A. D. 1884.

"Also that certain mine known as the Central Quartz Mining Claim, it being an extension on the northeast of the 'Evening Star Quartz Mine,' and 'commencing at this notice running thence in a northeasterly direction fifteen hundred feet to stake and mound of stones, thence in a northwesterly direction six hundred feet to stake and mound of stones, stake marked X, thence in a southwesterly direction fifteen hundred feet to a stake set in mound of rocks marked X, thence in S. E. direction to place of beginning.' The location notice of which said mining claim was dated January 1, A. D. 1884; and filed for record on the 8th day of January, A. D. 1884"; that at various times since 1898, the defendant corporation has wrongfully, etc., entered upon said premises and extracted, carried away, and appropriated large quantities of gold-bearing ore, etc., of the value of fifty thousand dollars.

Other allegations are added as a basis for equitable relief by injunction, receiver, etc., but these are not material to the questions to be considered. The defendant answered, denying all the material allegations of the complaint. The cause was tried by jury and a verdict found for plaintiffs for one dollar damages, upon which a judgment was entered, whereby it was adjudged and declared that the plaintiffs were and ever since September, 1887, had been the owners and entitled to the possession of the Evening Star and Central quartz mines—describing them as in the complaint—and awarding the damages and costs.

From this judgment and from an order subsequently entered denying its motion for a new trial, the defendant appeals, alleging certain errors in the rulings of the court, and claiming that in several material particulars the verdict is unsupported by the evidence.

The questions of fact thus presented are the more important and will be first considered.

The place from which the ore in question was removed by defendant is altogether outside of the surface-lines of the Central and Evening Star locations, but plaintiffs contend that defendant's mining was done in a portion of their *extralateral* claim, upon the dip of a vein covered by those loca-

tions. Specifically, their claim is that the ore removed by defendant was taken from a section of the vein included between perpendicular planes conforming to the end-lines of the Central mine at a point about one thousand feet east and two hundred feet south of the northeast corner of the Central location, according to the survey of the ground made by them a short time before the trial of the action. The defendant denies the validity of the Central and Evening Star locations, and also contends that, even if valid, their end-lines as actually located would not include the mining ground in controversy. Before entering upon a discussion of the evidence bearing upon these issues, it will be convenient to state a few well-settled legal propositions involved in their determination. There is no claim that the Central or Evening Star mine was located prior to the enactment of the Mining Law of May 10, 1872. (17 U. S. Stats. 91.) The claim is in fact that the locations were both made on the first day of January, 1884. Their validity, therefore, depends upon a substantial compliance, by the locators, with the requirements of that act. Among those requirements these were essential: *First,* the discovery of a vein; *second,* the marking of the location so that its surface boundaries could be readily traced; and *third,* (if the locator was to acquire any *extralateral* rights upon the dip of the vein) that the end-lines of his surface location should be *parallel.* The act of Congress does not require any posting or recording of notices of location. It merely permits the enactment of local laws regulating that matter, with a proviso that every notice of location, in order to have any legal effect, must contain certain particulars. In this case it does not appear that the claims in question were, at the date of their location, or at any time, included within an organized mining district. There is no evidence of any local law, and it was not until March, 1897, that the legislature of California enacted a short-lived statute prescribing the manner of locating mining claims, and providing for the posting and recording of notices. (Stats. 1897, p. 214; repealed March 20, 1899,—Stats. 1899, p. 148; February 8, 1900,—Stats. 1900, p. 9.) There was therefore nothing to give any definite legal effect to the posting and recording of the notices of location of the Central and Evening Star claims in January, 1884. They did not constitute in themselves a

location, or any part of a legal location, of the claims, and are of no value except as acts *in pais,* to be considered in connection with the well-known customs and practices of mining prospectors as an item of evidence upon the question of compliance with the imperative behests of the Mining Law, with respect especially to the marking of the surface location so that its boundaries can be readily traced, which is the vital question in the present case.

As to the discovery of a vein within the lines of the Evening Star and Central claims there is no question. As long ago as 1874, a mine known as the Klamath was being profitably worked in ground adjoining the Evening Star at its southern boundary. The extent and direction of the surface boundaries of the Klamath are not shown, but one of its corners was at the forked tree which is designated in the complaint and notice of location as the northwest and initial corner of the Evening Star. The evidence shows that during the year 1874, original locations of the Evening Star and Central claims were made after the discovery of a vein within the present limits of those claims. For several years after these original locations, work was actively prosecuted on the vein, extensive tunnels, drifts, etc., were run to and on the vein, and a large quantity of ore extracted and milled by the original locators. Finally, however, work on the mines ceased, and it seems that on the 1st of January, 1884, they were open to relocation as abandoned claims. At that time the croppings of the vein had been uncovered in a number of places within the surface now claimed by plaintiffs, and at the time this action was tried the testimony showed that they were exposed at the southwestern corner (erroneously designated in the complaint and notice of location as the northwestern corner) of the Evening Star, at the northeastern corner of the Central, and at a number of intermediate points. The underground work on the mine—the levels or drifts, extending many hundred feet between the foot and hanging walls—indicates that the course or strike of the vein within those limits is almost due north and south, and that its dip is to the east at an angle of fifteen or twenty degrees from the horizontal. There is also evidence sufficient to sustain a finding that this vein is identical with that upon which defendant has been mining.

The remaining questions of fact are these:—

*First.* Were the locations of the Central and Evening Star ever so distinctly marked on the surface by visible monuments as to be easily traced within the meaning of the Mining Law of 1872?

*Second.* If they ever were so marked, did the lines as defined by such monuments include in their extension the portion of the vein from which the defendant has been extracting ore?

*Third.* If they did include such portion of the vein, were they parallel?

The evidence upon these points cannot be easily or clearly stated or comprehended without the aid of a diagram, and in order to present the matter more simply I have constructed a diagram, based upon the evidence and the maps and the model prepared and introduced by the plaintiffs, which shows the location of the two claims according to the notices of location and the remaining monuments, side by side with their location, according to the survey and contention of the plaintiffs. The corners of the claims, according to the notices and monuments, are designated by the figures 1, 2, 3, etc. The corners, according to the maps, model, and surveys of the plaintiffs, are designated by the letters A, B, C, etc. The croppings of the vein are laid down as they appear in the model, or "illustrator," put in evidence by plaintiffs, and made part of the record on the appeal. The letter A and the figure 1 mark the point upon which all parties agree— the point where a forked tree formerly stood, and where its stump still stands (the "double-topped fir tree, blazed Evening Star" of the complaint and notice of location), the initial point of the Evening Star, of which the Central is an extension, i. e. another coterminous location on the strike of the same lode. Besides this stump of a fir tree and the croppings of the lode, there is no other undisputed monument to mark any corner of either location. But there is one—a pillar of rock about eleven hundred and sixty feet northeast of the stump—which I think is very clearly shown to be the pillar of rock marked E. V. at the northwestern corner of the Evening Star location, as the same is described in the complaint. There is about midway of the north end of the Central a rock placed upon another rock, and which plaintiffs contend marks the northern extremity of the *center-line* of the Central,

but there is very slight, if any, evidence to sustain this claim.

The location, or attempted location, of the Evening Star was made by one Keane, and that of the Central by one Rainey on the same day—January 1, 1884. They performed the necessary assessment work on the claims until the fall of 1887, when they sold out to the plaintiffs, who have since done more than sufficient work to hold the claims, if they are otherwise good.

Rainey is dead, and Keane had left the country. before he

sold to the plaintiffs in 1887. Their evidence, consequently, could not be had to prove what was done in the matter of marking boundaries, and there was no other direct evidence of any witness who saw any boundary-stakes or other monuments placed to mark their location, or who ever saw any monuments on the ground, save those above mentioned, which clearly were not sufficient in themselves to enable any one to trace the boundaries of either claim. The indirect evidence introduced at the trial for the purpose of proving the marking of boundaries, consisted exclusively of certified copies of the notices of their locations, which Keane and Rainey caused to be recorded in Siskiyou County on the 4th of February, 1884. These notices, as above shown, had no law behind them to give them any legal effect, and they were not competent evidence to prove even that they had been posted on the ground, and much less were they competent to prove the actual erection of the monuments which they called for, and which the law imperatively demands. The only competent evidence of the marking of boundaries is that of witnesses who saw the monuments placed, or who saw them standing after being placed. The contention on the part of plaintiffs that in the case of old claims which have been worked for years, and upon which no sufficient boundary-marks can be found, proof of original marking should be dispensed with, and a presumption indulged that they must have been properly defined by visible monuments which have been removed, or destroyed by fraud or the action of the elements, is without any authority to sustain it, and is contrary to the policy of the Mining Law as expounded in scores of decisions of the state and federal courts. It has been held over and over again under the old district mining laws, and under the different acts of Congress, that the policy of requiring a clear definition of the boundaries of mining claims by visible monuments on the ground was to enable subsequent claimants to locate with safety upon the residue by preventing the swinging and floating of the earlier locations. To subserve this policy, and as a matter of simple justice, the locators of mining claims are required, not only to mark their location at the time it is made, but to use reasonable diligence in preserving and restoring their boundary monuments as occasion may require.

If they and their successors in interest neglect this pre-
caution for a long series of years, as in this case, they expose
themselves to the hazards incurred by these plaintiffs, of losing,
by the death or absence of the original locators and other wit-
nesses, the necessary means of proving the validity of the
original location by the only competent evidence of the essen-
tial requisites of such locations. The law puts locators of
mining claims under no compulsion to procure patents for
their claims within any limited period. They are allowed to
hold them and work them without paying the government
price of the land, or having their boundaries fixed by govern-
ment surveyors, and by a public and authentic record, as
long as suits their convenience; but in the mean time they
must do a certain amount of work upon the claims every
year. The necessity of doing this work involves the oppor-
tunity of performing annually the easy and obvious duty of
inspecting and preserving their boundary monuments, and
there is no necessity, in order to promote the just policy of
the Mining Law or any feature of it for indulging the pre-
sumption that claims have been sufficiently marked merely
because they have been known as such for a number of years.

But this view of the law with respect to the presumption
invoked by the plaintiffs—to sustain which they cite no au-
thority—is of little consequence in the present instance, by
reason of the fact that copies of the recorded notices of the
location of the Central and Evening Star locations were
admitted in evidence without objection. By their silence
counsel for defendant waived any objection to the incompe-
tency of the notices, and so far as they tend to prove—together
with the remaining monuments on the ground—that the
boundaries of the claims were properly marked at the time,
they must be treated as evidence in the case. In this view
they are to be considered as proving at most the things that
they state, and for the purpose of determining what they do
prove it is necessary to set forth their material contents.
That of the Evening Star reads as follows:—

"Notice is hereby given to all whom it may concern, that
the undersigned . . . has located fifteen hundred feet of this
vein or lode of gold-bearing rock, with surface ground six
hundred feet in width, in Liberty Mining District, county of
Siskiyou, state of California, and known as the Evening Star

Quartz Mine, it being a relocation of an abandoned mine, and subject to relocation in accordance with the United States statutes in such cases made and provided, particularly described as follows: Situated on the headwaters of Eddy's Gulch, county and state aforesaid, commencing at a double-top fir tree blazed 'Evening Star,' and on the N. W. corner of the claim, thence in a N. E. direction fifteen hundred feet, more or less, to a pillar of rock marked 'E. V.,' thence S. E. direction six hundred feet to a monument of stones and stake marked 'E. V.,' thence in a S. W. direction fifteen hundred feet to monument of stake and stones, stake marked 'E. V.,' thence in a N. W. direction six hundred feet to place of beginning. And I intend to hold and work the same as provided by the laws, customs and rules of miners and the mining statutes of the United States.

"Dated on the ground this first day of January, A. D. 1884.
"Location January 1st, 1884.

"JAS. E. KEANE.

"Attest: B. W. JENCKS. FRANK VARGAS."

The Central notice reads as follows:—

"Notice is hereby given to all whom it may concern that the undersigned . . . has located fifteen hundred linear feet of this vein or lode (with surface ground six hundred feet in width, situated on the head waters of Eddy's Gulch, Liberty Mining District, county of Siskiyou and state of California, and known as the Central Quartz Mining Claim. It being an extension on the northeast of the Evening Star Quartz Mine, and this being a notice of relocation of an abandoned mine and subject to relocation under the laws in such cases made and provided—commencing at this notice, running thence in a northeasterly direction fifteen hundred feet to stake and mound of stones, thence in a northwesterly direction six hundred feet to stake and mound of stones, stake marked X, thence in southwesterly direction fifteen hundred feet to stake in mound of rocks marked X, thence in a S. E. direction to place of beginning; and notice is hereby given that I intend to work and hold said claim as provided by local customs and rules of miners and the mining statutes of the United States.

"Dated on the ground this first day of January, A. D. 1884.
"Located January 1st, 1884.

"Attest: JAMES RAINEY, Locator."

These notices, it is to be remembered, are the evidence submitted by the plaintiffs, and the most substantial evidence they had to offer for the. purpose of proving the boundaries of their claims; and taking them as a guide, what do they prove? In the first place, it is to be noted that the Central was located as an extension of the Evening Star, and this means that the Evening Star was first laid off on the ground. Another point is, that each notice claims fifteen hundred feet of *"this vein or lode,"* which indicates that each notice as posted on the ground was placed on the croppings of the lode, or in such close proximity to the point where the croppings appeared, or had been exposed, as to make the expression *"this vein or lode"* mean what it said. This is all the more probable from the well-known practice of miners to place their location notices so close to the point where the vein is exposed that one who sees the work on the croppings cannot avoid seeing the notice.

The locators of the Evening Star and Central claims then proceeded as follows: They placed the Evening Star notice on the forked tree which, as the diagram shows, stood within a few feet of the croppings of the lode. They then went to the pillar of rock on a course about thirty-two degrees east of north. Probably they did not measure the distance, because the notice calls for fifteen hundred feet when the real distance by actual survey is only eleven hundred and sixty-six feet. From that point they must have gone on a course thirty-two degrees south of east to the next corner of the claim, for the claim is six hundred feet wide, and the measured distance from one corner to the other is six hundred feet; from which it results as a mathematical necessity, that the end-line must have been run at right angles to the side-line. This also is exceedingly probable for other reasons, because miners know that the side-lines of a claim ought to be parallel to its strike and its end-lines at right angles to its strike. And they are well acquainted with the simple expedients by which a perpendicular can be raised from any point on a fixed line with no other aid than a tape measure, an article in universal use by prospectors and locators of claims. Another circumstance of peculiar significance is that a six-hundred-foot line run at right angles to the line between the fir tree and the pillar of rock places the third corner of

the Evening Star very little outside of the croppings of the vein, and so near as to explain the action of Rainey in selecting the monument placed at that corner for his starting-point instead of the more conspicuous monument at the other corner. His notice, like Keane's, calls for so many feet in length on "this vein or lode," and he naturally placed it on a corner where the vein appeared in order that the words of the notice might show what vein was meant, and that the vein might show what the notice meant—that each might illustrate the other. Still another fact confirming the assumption that the end-lines of the Evening Star were at right angles to its side-lines, and extended in a northwest and southeast direction is the designation in the notice of the initial corner as the northwest corner. The fact that the fourth corner was southeast of it is the only possible explanation of that mistake. If, as plaintiffs claim, the fourth corner was due east of the first corner, the mistake in calling the latter the northwest corner would be inexplicable. So much for the evidence bearing upon the direction of the end-lines of the Evening Star. According to the notice, monuments of stones with stakes marked "E. V." were placed at third and fourth corners. (See reduced diagram attached hereto.)

If Rainey in locating the Central made it coterminous with the Evening Star, as the plaintiffs assume, and as its designation as an extension implies, his initial point was the northeast corner of the Evening Star—a highly probable assumption, as has been shown—and he measured (probably with a tape-line) fifteen hundred feet in the same general direction to his northeast corner, which he marked with a stake in a mound of stones. According to the other calls of the notice, he laid off a rectangle fifteen hundred feet long and six hundred feet wide, marking the third and fourth corners with stakes and mounds of stones. The only monument now to be found answering to these calls, the only monument known to any witness in the case, is the monument consisting of one stone laid upon another, which plaintiff contends marks the end of the center-line of the Evening Star and Central mines. The ground of this contention does not appear. There is no call in the notices for a monument in the middle of the end-line of either claim, and no witness testifies that any such monument was ever placed by any locator or

CXLIX—Cal.—24

owner. It is a much more probable supposition that it really marks the northeast corner of the Central as located by Rainey, for it is just about fourteen hundred and fifty feet from his starting-point on a course varying somewhat less than ten degrees from that of the line between the forked tree and the pillar of rock. In other words, it is quite as near the point called for in the notice as could be reasonably expected in a measurement of a line of that length in a rough country with no means of keeping the direction except sighting by natural objects.

I have now stated all that the notices tend to prove with respect to these locations, and allowing them the effect of competent evidence, upon the ground that defendant made no objection to their admission, it may be conceded that they establish a *prima facie* case of valid locations of the Central and Evening Star with end-lines substantially parallel. But they establish end-lines which do not include the ground in which the defendant has been mining. Referring to the diagram, the defendant's mining operations have been conducted at a point between the diverging lines, 5—6 and C—D, about a thousand feet east of the corner marked 5, and within the surface-lines of a claim called the Golden Eagle, a claim which is in the possession of the defendant, and was located prior to the survey of their claims by the plaintiffs, for the purpose of definitely locating or relocating their side- and end-lines. The surveyor, Nolan, was not called as a witness at the trial, but a map based upon his field-notes and made by John Daggett, together with a model also constructed by him from the same data, were put in evidence, and his son, B. F. Daggett, who assisted in making the survey, testified in regard to what was done, and what was discovered on the ground. The figure marked on the accompanying diagram by the letters A, B, C, D, E, F shows the lines of the Nolan survey in relation to a diagram of the claims according to the notices of location and the two certain monuments. It will be seen that they differ very radically—the most material difference being that the end-lines of the Central, according to the Nolan survey, embrace that portion of the *extralateral* dip of the vein where defendant had been mining, while the end-lines, according to the notices of location, leave it outside. The question is, What has this map to support it?

The notices of location and the existing monuments, including the croppings of the vein, certainly do not. It departs from them at every point except the point of beginning. The testimony of B. F. Daggett is to the effect that the intention in making the survey was to follow the calls of the notices as controlled by existing monuments. The only monuments they found were the forked tree where they commence to survey, the pillar of rock eleven hundred and sixty feet northeast of the tree, and the pile of stones which they *assume* to be a mark of the middle of the Central on its north end. This assumption, based upon no evidence whatever, accounts for the form of the Nolan survey in all of its departures from the calls of the notices, and it is proper here to reiterate the fact that no such monument is called for in the notices, and that no witness testifies that any such monument was ever placed by the locators. In order to get it on the end of a center-line every certain as well as every indefinite call of the notices must be disregarded, as in fact they were, in making the survey. Instead of running from the forked tree to the pillar of rock, they ran on a line (N. 33½° east) which carried them thirty-five feet east of the rock, and instead of stopping at the rock, they put their stake to mark the corner B, exactly eighteen chains (1188 feet) from the tree; then, continuing on the same course, they measured off another eighteen chains, and stopped at C, where they discovered no sign of a monument, but it was a point from which a line drawn through the assumed center-line monument would cross the strike of the vein at right angles. Then they went on to the other corners—D, E, F—without finding any traces of former monuments. The result is a map of two lozenge-shaped claims six hundred feet wide, according to the scale, and involving these discrepancies: *First.* They have no corner at the pillar of rock; *Second.* Side-lines of the Central are eleven hundred and eighty-eight feet in length when the call is for fifteen hundred; *Third.* All the end-lines of both claims are seven hundred and twenty feet long instead of six hundred; *Fourth.* The point where Rainey is assumed to have posted his notice of location is over one hundred and fifty feet from the croppings of the lode, which it designates as ''this vein or lode''; *Fifth.* The designation of the first corner in Keane's notice as the northwest corner is deprived of the

small measure of propriety that it would have if the fourth
corner of the Evening Star was at 4 instead of F.

All these departures from the calls which the survey assumed
to follow are justified by the gratuitous assumption that the pile
of rock at the north end of the .Central was so placed by the
locators to mark its center-line. There is not a particle of evi-
dence to warrant this assumption, and by reference to the dia-
gram it will be seen that if the west side-line of the claims had
been run through the pillar of rock instead of thirty-five feet
to the east of it, this pile of rock would have been more than
seventy feet from the true center-line of the claim.

A court cannot be expected to accept as evidence a map
which departs so widely from the certain data established by
the best evidence plaintiffs have to offer for the purpose of
proving the original location of their claim.

A map in itself proves nothing, unless it is first shown by
competent evidence to be a correct representation of the rela-
tive positions of the objects it purports to delineate. A map
purporting to show the lines of a location of a mining claim is
of no probative value unless supported by the evidence of
some one who knows the position of the monuments which de-
fined those lines; for it is by the location monuments alone
that their beginning, end, and direction can be determined.
Here, as we have shown, there is no witness to the location of
more than two of the corner monuments—the tree and the
pillar of rock at the southwest and northwest corner of the
Evening Star. For the positions of the others we have no
better evidence than the calls of the notices of location—evi-
dence offered by plaintiffs, and essential to their case, and to
which all their other ·evidence is necessarily secondary. Are
we to take the notices of location as evidence that the claims
were duly located, and reject them in favor of a theory or
conjecture as to the *situs* of the location monuments? This, in
fact, is what we are asked to do.

The plaintiff John Daggett, who gave directions for the sur-
vey, stated more than once in the course of his testimony the
theory ·upon which he contends the end-lines of the locations
should be fixed. The design of the law is that they should be at
right angles to the vein, and the deeper workings on this vein
having shown that its course is north and south, the end-lines
should be extended east and west to conform to its dip, and

therefore that the law itself gives him these lines. This is the theory fully supported by the provisions of the Mining Law of 1866 [14 U. S. Stats. 251], as held by this court in the Argonaut case (131 Cal. 15, [65 Pac. 148]), and it obtained among miners and lawyers for some time after the passage of the act of 1872. In one of the earliest cases arising under that act (*Gleeson* v.*White*, 13 Nev. 499), I made it the ground of my decision upon a question as to the sufficiency of a surface location, and in the celebrated "Horseshoe" case (*Iron Mining Co.* v. *Elgin Mining Co.*, 118 U. S. 209, [6 Sup. Ct. 1177]), it was the ground of the dissenting opinion of Chief Justice Waite, concurred in by Justice Bradley, on a question of *extralateral* right. But in that case the theory that the law will give to the locator any lines except those which he has defined by visible monuments on the ground, was definitely rejected by the supreme court of the United States—the final arbiter upon such questions—and the same decision was made in a later case. (*Del Monte Mining Co.* v. *Last Chance Mining Co.*, 171 U. S. 55, [18 Sup. Ct. 895].) This, and other pertinent questions, were reviewed by the late Justice Temple, with his usual ability, in his opinion in the Argonaut case, *supra,* where we held with respect to a patent issued after 1872 upon a claim located under the act of 1866, that the law did establish end-lines for the locator conforming to the dip of the vein and gave him *extralateral* rights, nothwithstanding the lack of parallelism in the end-lines of the surface claim as patented. But the opinion in that case distinctly recognizes the change effected by the act of 1872 with respect to claims thereafter located, viz. that the locators acquire no *extralateral* rights to the dip of the vein unless their end-lines have not only been marked on the surface, but have been made parallel.

The following quotations from Mr. Daggett's testimony will be sufficient to show that his controlling idea in laying off the boundaries of his claims was the right of the locator to adjust his end-lines to the true course and dip of the vein. On his cross-examination regarding the end-lines of the claims as delineated on his map and model, he was asked: "Q. Why was it you made the end-lines take a slant like that [showing]?—A. Because I might say the Mountain Laurel done the same thing, and really because that is the proper method to work a mine— a mine on its surface is very little—on the surface—from the

croppings on the surface here. Over 1200 feet from here to here, and running on the vein, I have concluded that it is the true dip of the vein [showing], and I am entitled to take that as the dip of the vein.'' The answer to the question is not strictly responsive, except at the end, where he makes it plain that he gave a slant to the end-lines in order to make them conform to the dip of the vein as developed in the deeper workings in the mine.

Again, when questioned as to the instructions given Nolan with respect to the survey, he explains why the west side-line of the Central was ended at C (three hundred and twelve feet short of the call of the notice and where no monument was found) : ''He was instructed to run a certain distance, which commenced in there—to run a certain distance, and the direction was given in the notice to run to a pillar of rock, and that is right in there; they, of course, commenced in here and went as far north as would confine the croppings within the north end-line, and we all concluded that we couldn't go any farther because there was no vein up there [showing], and that took this line in the direction of the dip of the vein.'' Which means that they stopped at that point because the vein, according to its true course, extended no farther north within his side-lines, and stopping there would take his end-line in the direction of the dip. The position of the monuments was, in other words, a subordinate consideration—the dip of the vein a controlling consideration in making the survey.

Throughout the argument of this case, counsel for respondents have been challenged to point out the evidence in the record which supports a finding that the north end-line of the Central Mine will include the part of the vein from which defendant removed the ore in question, and on the reargument their attention was especially directed to this matter. They could point to nothing except the evidence of Mr. Daggett, Sr., who did state several times that he had always known, before and after he had acquired the Central Mine, that its northern boundary was at the place where the croppings of the lode protrude under a certain flume, the position of which is not given on the maps, but which I have no doubt corresponds to his line as delineated on his map and model.

This evidence would, perhaps, support the verdict if Mr. Daggett had not frankly admitted on his cross-examination,

that he never knew of his own knowledge of but one monument at the north end of the Central. I quote his examination on this point: "Q. Then I don't understand you to say that you ever laid out the Central location by finding the monuments James Rainey erected, if he erected any?—A. We found one. —Q. You found one monument?—A. One end central line.— Q. One end central line?—A. Yes, sir.—Q. Was that the only monument you found?—A. You had better get the surveyor on the stand; he will remember it.—Q. Well, so far as you know?—A. Yes.—Q. That was the only monument you know about the Central Mine; was the only monument you ever saw on the Central Mine?—A. From my own observation, yes.— Q. You never run across any of the monuments, except the one you stated, of the Central Mine as laid out by James Rainey?— A. Yes, sir; that is all.—Q. And what point on the Central Mine would that be with reference to this map here? Show it to the jury, please.—A. Just about there; right near the center.—Q. That would be the north end center?—A. Right on the north end center.—Q. What was it?—A. A rock placed on another rock, with a blazed tree around down from it; done years ago." This shows that Mr. Daggett was incompetent to testify as to the direction of the end-line. No one can know the direction of a straight line without knowing two points on the line, and he knew but one. Of course, with a knowledge of this one point on the line, and of the dip of the vein, he could, upon his theory of the proper relation of the end-lines to the dip, give the direction of the line, but, as above pointed out, it is the line fixed by the monuments, and not the line indicated by the dip of the vein, that controls in favor of intervening rights. Of course, it is not to be denied that before a patent, and before an adverse right has accrued to a subsequent locator, end-lines may always be readjusted to conform to the true course and dip of a vein, but this can only be done by remarking the surface location, so that its new boundaries may be readily traced—which is, in effect, an abandonment of the old location and the marking of a new one.

For the reasons here given, I am convinced that there is no substantial evidence that the north end-line of the Central Mine was ever defined by any monuments on the ground as a line extending east and west. On the contrary, all the evidence introduced by the plaintiff tends strongly to prove that, instead

of running from C to D, the north end-line of the Central actually ran from 5 to 6,—unless, as I consider highly probable, it ran from the pile of rocks at the north end of the claim six hundred feet to the northwest, at right angles to a line drawn from 3 to said pile of rocks, for if the pile of rocks was a monument of the claim as located, it can only have been a corner monument, and, if so, the monument placed to mark the northeast corner.

But there is another fatal flaw in plaintiff's case, as to which there is an absolute failure of evidence. One of the specifications of particulars in which the evidence is insufficient to sustain the verdict is this: "There is no evidence that the claim as marked upon the ground had its end-lines parallel, so as to entitle plaintiffs to follow the vein beyond the side-line of the claim."

To this proposition, neither the record nor the argument of counsel furnishes any answer. If it could be conceded that the north end-line of the Central·ever was marked by visible monuments at C and D, or in any other way, there is not a particle of evidence that its south end-line ever was laid off on the line B—E, or that the south end-line of the Evening Star extended from the forked tree to F.

No monument, or trace of a monument, was found at D, but a stake of the Nolan survey was placed there, because it was the point of intersection of a line (720 feet long) drawn due east from C, with a line parallel to the west side-line and six hundred feet distant therefrom on a perpendicular. The point E was determined by measuring merely, no sign of a monument appearing there, and point F in the same manner. There is no sort of evidence that any monuments ever stood at either of these points, but very persuasive evidence, as above shown, that Rainey's notice was posted on or near the croppings of the vein at the point marked 3, and that his end-line extended from that point six hundred feet to the pillar of rock. If this is so—and there can be no other conclusion based upon the evidence—plaintiffs have no *extralateral* rights whatever, unless their north end-line ran from 5 to 6, which would not include defendant's claim. Upon any hypothesis the verdict is unsupported by the evidence.

Upon other points, including the question as to the identity of the lode upon which defendant is mining with that which

has the outcrop within the lines of the Central, we think there was evidence sufficient to sustain the verdict.

Regarding the errors assigned upon the rulings of the court at the trial, the first to be considered is an exception to the admission of evidence that defendant had extracted ore from the locality above described. This evidence was objected to upon the ground that it tended to prove a fact not alleged,—a matter without the issues,—the point of the objection being that the complaint described only a surface claim, and alleged an entry and trespass upon "said premises," which it is contended is insufficient to authorize proof of a trespass outside of the surface so described. We do not think that in an action for trespass upon the *extralateral* dip of that part of a vein which has its apex within a valid location it is strictly necessary for the plaintiff to allege the existence of a vein having its apex within his surface boundaries, but departing from his side-lines on its downward course and that his end-lines are parallel (see, generally, *Central Eureka Mining Co.* v. *East Central Eureka Mining Co.*, 146 Cal. 147-157, [79 Pac. 834]), but it would be better pleading to allege the facts specifically, in order to present the issues more definitely and prevent surprise. In this case it does not appear that defendant was misled, and there is no occasion, with a view to a new trial, for any further discussion of the matter.

There was a ground, however, upon which the objection to this testimony should have been sustained. The description of the Central claim in the complaint was substantially as it is delineated on the diagram by the figures 2, 3, 5, 6, and the mining of defendant was proved at a point not only without the surface-lines of that claim, but altogether outside of its end-lines extended in their own direction. It does not appear, however, that this point of objection was pressed upon the attention of the court, and if it had been pressed it could have been cured by amendment at the trial.

The only other objection to the ruling of the court seriously urged by the appellant relates to the evidence of lode identity. Counsel contend, in effect, that the only competent proof of a trespass upon the *extralateral* dip of a vein is by an actual tracing from within the surface-lines of the location, down to the point of the alleged trespass—a literal following down by continuous excavation between the hanging- and foot-walls.

We do not find any authority supporting this proposition, and do not consider it reasonable. The burden of proof in all such cases is upon the plaintiff to show by satisfactory evidence the continuity of the vein between its apex within his lines and the point at which the defendant is mining, but there are entirely satisfactory modes of proving identity in such cases without an actual tracing, and, as above said, we think there was in this case sufficient evidence to sustain a finding that the defendant's mining was done on the same vein which has its apex within the lines of the Central Mine.

There are no other points requiring notice.

On the ground that the evidence does not sustain the verdict, the order and judgment of the superior court are reversed and the cause remanded for a new trial, with leave to the parties to amend their pleadings as advised.

Lorigan, J., Angellotti, J., and Sloss, J., concurred.

McFarland, J., Shaw, J., and Henshaw, J.—We dissent, and adhere to the opinion heretofore delivered in Department, and in the conclusion therein reached. We think that the judgment and order appealed from should be affirmed.

The following is the opinion rendered in Department Two, referred to in the dissenting opinion:

McFARLAND, J.—This is an action to recover damages for alleged trespass by defendant upon certain quartz mines of plaintiffs. The jury returned a verdict for plaintiffs with damages in the sum of one dollar. From the judgment and from an order denying a new trial the defendant appeals.

The only serious question in the case is whether when a complaint describes a quartz mine by its name and the boundaries which constitute the surface location, and avers that the defendant wrongfully entered upon the premises and extracted valuable ore from the mine, a recovery can be had for ore taken from a place outside of the plaintiffs' surface location, but from a vein or ledge the apex of which is within plaintiff's exterior surface-lines, and which dips laterally beyond a side-line. It is averred in the complaint that plaintiffs are, and for more than twenty years last past have been, the owners and in possession of "those certain quartz mines, situated  .  .  .

and known as the 'Evening Star Quartz Mine' and the 'Central Quartz Mine,' which mines are particularly described as follows''; and then the surface location of each mine is given by metes and bounds, the one being an extension of the other. It is then averred that defendant wrongfully entered upon ''said premises,'' and extracted and carried away from ''said mines'' large quantities of gold ore of a certain named value, and the prayer is for damages for such wrongful acts. Defendant by its answer denied that it entered upon said mines, or took any ore therefrom. At the trial plaintiffs did not attempt to prove that defendant entered within or beneath the surface-lines of their mines, or took any ore therefrom. They introduced evidence, however, tending to show that a certain quartz ledge, the apex of which was within their surface-lines, dipped laterally beyond one of the side-lines of the surface location, and that defendant had taken ore from said ledge at a place beyond said side-line. To this evidence defendant objected upon the ground that there was. no averment in the complaint ''that defendant had extracted gold outside of the vertical planes bounding the Central and Evening Star mines.'' The objection was overruled, and defendant excepted, and the question thus raised by this objection is the main one presented in the record; that is to say, if the owner of a quartz mine seeks to recover damages for trespass upon his ledge committed outside of the lines of the surface location, must he specially aver the particular place at which the wrongful acts were committed?

The question above stated seems to be a new one, and no precedent in point has been cited. If at a trial under such a complaint the defendant should be really surprised at plaintiffs' attempt to prove acts done wholly outside of his surface-lines, perhaps the trial court might properly consider that fact a good ground for a motion for a continuance of the trial. But no such fact appears in the case at bar, no motion for a continuance was made, and the course of the trial shows that defendant knew that plaintiffs were suing for trespasses committed outside of their surface-lines, and apparently was fully prepared to contest that issue. Therefore defendant was not actually prejudiced by what it asserts to be a failure in the complaint to cover the offered evidence, and the question presented is simply an abstract question of pleading. We think

that the court was right in overruling the objection, and that the evidence was admissible under the complaint. The main thing of consequence and value to the owner of a quartz mine is the ledge the apex of which is within the surface-lines of his claim. Such ledge, within his end-lines, is a constituent part of his mine, no matter at what dip or angle it may go laterally downward in the earth. If it goes beyond his side-lines, it is still as much a part of his property and estate as the part within such lines. The valid location of a quartz mine gives notice to all the world that the locator owns every ledge the apex of which is within his surface-lines, no matter where it may be at certain depths below the surface. Therefore the description in a complaint of a quartz mine which gives the name of the mine and the boundaries of the surface location includes (within the end-lines) as an integral part of the mine the whole of the ledge the apex of which is within the surface-lines; and in a complaint for trespass on a quartz mine there is no more necessity for stating the particular part of the property on which the trespass was committed than there would be in an action for trespass on a placer mining claim, on a tract of agricultural land, or on a town lot.

It is contended that there was no sufficient evidence of a valid location of plaintiffs' claims,—that is, that the boundaries were not sufficiently marked so as to be readily traced; but we do not think that this contention is maintainable. Plaintiffs claim under relocations made about eighteen years ago. Long before that time the claims had been previously located, and a great deal of work done on them, and their boundaries were well known. Some of the marks on the old locations were used in the new locations. Considering that the locations were made a long time ago, and that the claims were in possession of plaintiffs and their grantors for a great many years, we think that there was a sufficient showing of marking by which the boundaries could be readily traced. Some, though not all, of the monuments were found. No doubt the evidence would have been more satisfactory if the two relocators, one of whom seems to have been dead and the other long absent from the state, had been witnesses. When the owners of a mining claim have owned, possessed, and worked it for a long period of time without any dispute as to its boundaries, they are apt to become careless in the matter of

keeping up monuments on their corners and lines; and in such case, when the point made against them is that their entire title to the mine is void for want of sufficient marking, rigid proof in detail of the original marking of every part of the boundaries should not be expected. And in view of these considerations we think that there was reasonably sufficient evidence of the lines of plaintiffs' claims to answer the contention that for want of such evidence their entire title was invalid.

It is also contended that the evidence was insufficient to show that the ledge on which defendant worked was identical with the ledge the apex of which was within plaintiff's surface-lines. But this contention is also not maintainable. Of course, in such a case it is not necessary that the ledge should have been continuously exploited, uncovered, and absolutely traced from the apex to the point in dispute. It is sufficient if the identity be shown to the jury by a clear and strong probability. And we think that in the case at bar such probability of identity was clearly shown by the testimony of plaintiffs' witnesses, and particularly by the testimony of the plaintiff John Daggett when on the witness-stand, as well as by the admission of the superintendent of defendant, which was admitted without objection.

The foregoing covers substantially all the points made by appellant. The judgment and order appealed from are affirmed.

Rehearing denied.