## No. 10,324.

RICO-ARGENTINE MINING CO., ET AL. *v.* RICO CONSOLIDATED MINING CO., ET AL.

Decided October 1, 1923. Rehearing denied February 4, 1924.

Action to recover value of ore mined, and for injunctive relief. Judgment for plaintiffs.

*Reversed.*

1.  STATUTES—*Federal—Interpretation.* Congressional enactments should be interpreted by federal, rather than by state courts, and the interpretation of the former will be followed by Colorado courts.

2.  MINES AND MINING—*Extralateral Rights.* Extralateral rights are conferred where the discovery vein crosses only one side line; where it crosses one end line and one side line; where it crosses the same side line twice and where it crosses neither end line. The only exception is where it crosses both side lines.

3.  *Course of Vein—Presumption.* The presumption is that a vein continues regularly along its course.

4.     *Lode—Defined.* Lime beds replaced with minerals, fractured and faulted, as indicated by the evidence in the case under consideration, constitute a lode.

5.     *Extralateral Rights—Intersecting Veins.* A senior location only can be followed across the side line on the dip. When veins or lodes unite on their dip, the older location takes all the ore at the point of intersection, and the whole vein thereafter.

6.     *Apex—Determination.* The contention, in the case under consideration, that the source of mineralization determines the apex of the vein, overruled.

7.     *Extralateral Rights—Barren Vein.* One holding the senior location may follow a barren vein into adjoining territory, if ore be found by sinking on the dip of such vein.

*Error to the District Court of Dolores County, Hon. William N. Searcy, Judge.*

Mr. TYSON S. DINES, Mr. ROBERT E. MORE, Mr. REESE MCCLOSKEY, for plaintiffs in error.

Mr. L. W. ALLEN, Messrs. CHENEY, JENSEN, HOLMAN & STEPHENS, for defendants in error.

*En banc.*

MR. JUSTICE SHEAFOR delivered the opinion of the court.

THE defendants in error brought this suit to recover from the plaintiffs in error the value of ore taken by them from within the boundaries of the plaintiffs' Allegheny lode mining claim, and for injunctive relief. The parties will be designated here as they were in the court below.

The defendants admitted the taking of the ore, and claimed that they were entitled to the same upon the theory that the apex of the vein, from which the ore was mined, is within their property. The trial was to the court without a jury. Findings were for the plaintiffs that they were entitled to recover the value of the ore taken, and also entitled to the injunctive relief prayed. The defendants bring the case here for review.

The position of the parties, more fully stated, is as follows: The ore bodies involved are within the surface boundaries of the plaintiffs' Allegheny claim. The plaintiffs claim that the ore bodies are connected with the Allegheny vein, which cuts through them, and that the apex of the Allegheny vein is the true apex of the ore bodies in question. They claim that the four lime beds, more particularly hereinafter mentioned, have been mineralized by the Allegheny fissure. A further contention of the plaintiffs is, that the four stopes in the lime beds mark the extreme limits of the mineralization in the lime beds and that the mineralization of the beds proceeds no further than the present stopes; in other words, that the mineralization does not extend above, and to the south of the stopes to the Black Hawk fissure, as contended by the defendants, and they deny the existence of the Black Hawk vein.

The defendants contend that the ores taken from beneath the boundaries of the Allegheny claim, were taken from veins apexing within defendants' Wide Awake and Black Hawk claims, and belong to defendants by virtue of the dip rights given under the acts of congress. The seniority of the location of defendants' claims, over plaintiffs' claim, is admitted. Defendants' Wide Awake and Black Hawk claims adjoin one another and have a common side line; the Allegheny claim of plaintiffs adjoins defendants' Black Hawk claim on the easterly side of the latter, and the westerly end line of the Allegheny claim constitutes a part of the easterly side line of the Black Hawk claim. Four different stopes starting at the surface near the center of defendants' Black Hawk claim, have been sunk in a general easterly direction beyond the easterly side line of the Black Hawk claim and extending into plaintiffs' Allegheny claim. Plate 1 following will aid to a better understanding of the location of the claims:

PLATE 1

The defendants claim that the beds of limestone involved in this controversy were laid down one upon another, and that an upheaval came and these beds were thereby tilted to an angle of 35°; that this was followed by fracturing and faulting and that the greatest of these fractures in this particular district is known as the Black Hawk fault; that this fracture cut through all these uptilted beds and faulted the beds on the northeast side from 400 to 600 feet below those on the southwest side of the fault. They further contend that the Black Hawk fault was the source of deep-seated mineral solutions, which ate out portions of the lime beds, and left in their stead, replacement deposits of the precious metals; that other fissures, notably the Schreiber and Fields fissures, took an active part in the mineralization; and that the latter two did more than any other fissure in controlling the rake of the commercial ore shoot. The four stopes mentioned are claimed by defendants to be in such replacement veins and are called respectively beds 1, 2, 3, and 4, bed 1 being the lowest, and bed 4 the highest; that the discovery of the Black Hawk claim is upon the No. 4 replacement vein. Defendants further contend that while the stopes marked the limits of the commercial ore, above and to the south of

each stope there was to be found complete pyritic mineralization, following up the dip of the replacement veins to a point where the Black Hawk fault was encountered, and that above the point of union of the replacement veins and the Black Hawk vein, both replacement veins and the Black Hawk vein were one, and proceeded to a common apex, at the surface, within the side lines of the Black Hawk claim, a portion of this apex outcropping on the surface, and a portion being underground, and that this apex more nearly parallels the side lines of the Black Hawk claim than it does the end lines. The following plates 2 and 3 give a clearer idea of defendants' contention in the particulars mentioned:

PLATE  2

PLATE Ⅲ

The defendants make the further contention that even though it should be found that the apices of the four replacement veins cross the southwesterly side line of the Black Hawk claim and continue up on their courses to the quartz vein in the Wide Awake claim, still, defendants own all the ore in controversy by reason of their ownership of the last named claim; that veins 1, 2, 3, and 4 and the quartz vein, constitute secondary veins in the Wide Awake claim; and that defendants are entitled to extralateral rights upon these veins, regardless of their course or extent, the apex of the quartz vein being within the surface boundaries of the Wide Awake claim.

The trial court found in substance that the mineralized apex of No. 4 vein did not extend more than 50 feet northerly nor more than 40 feet southerly from the point of discovery in the Black Hawk claim; that the lime beds in question are not shattered, as claimed by defendants, but retain, between the upper and lower stopes, within defendants' side lines, their original character of stratified country rock without mineralization of any kind, except

local and occasional replacement deposits of ore and iron.

The court further found: "As to the right of defendants to the ore bodies in controversy arising from the location of the discovery upon the apex of No. 4 bed, as represented upon defendants' exhibit B, the court finds that the mineralized ore body in bed No. 4 extends continuously from the discovery point downward easterly, to the area in conflict. But that the lime bed upon which the location is made crosses both the northeasterly and southwesterly side lines of the Black Hawk claim."

In an effort to demonstrate complete mineralization above and to the south of the stopes up to the Black Hawk fault, the defendants after the trial, made a raise, called the new trial raise, of over 100 feet from the conflict area, directly up the dip of one of the replacement veins toward the point where the defendants claimed the Black Hawk vein would be encountered, but the raise was not completed to that point. What this raise revealed, respecting mineralization, together with the affidavits of Price, Chase, and Stampfel, were used by defendants in support of their motion for new trial. A better understanding of defendants' contention as to the mineralization disclosed by the new trial raise, and the ore deposits claimed by them to exist in the Dining Room, Log Cabin and Bunkhouse tunnels, will be had by reference to plate 7 following. It should be noted however that plaintiffs do not concede the correctness of plate 7 and claim that there is a dispute as to the facts:

PLATE VII

In overruling defendants' motion for new trial, the trial court held that the apex claimed by defendants in the Black Hawk claim, and as shown upon defendants' new trial exhibit U, extends across one side line of the claim, and that it is not parallel to that line, across which extralateral rights are claimed, and that it is the apex of the discovery vein.

The trial court then said: "And, if we assume that the newly discovered evidence would be sufficient to extend the mineralized area of bed 4 for a considerable distance to the south beyond the limits indicated by the findings of the court, we still have the same condition—of the discovery apex crossing the northeast side line of the claim only; not running substantially parallel to that line; and that line the very line beyond which the extralateral rights are claimed."

In holding that in such circumstances the defendants would not be entitled to extralateral rights, we think the trial court erred. Assuming the existence of the Black

Hawk or Manganese vein, and assuming that the apex is as claimed by defendants and as delineated upon their new trial exhibit U, and assuming that the newly discovered evidence would be sufficient to extend the mineralized area of bed 4, as stated by the court, then extralateral rights would be conferred.

The case of *Catron v. Old*, 23 Colo. 433, 48 Pac. 687, 58 Am. St. Rep. 256, has been cited by plaintiffs, but this can no longer be followed as authority for the contention that, "where the vein upon its strike enters the claim by crossing one side line and leaves the claim at the same side," no extralateral rights exist. In the instant case, however, the vein crosses the side line once only.

Section 2322, Revised Statutes of the United States provides, *inter alia,* that the owners of the surface shall be entitled to all veins, lodes or ledges throughout their entire depth, where the top or apex of such vein lies within the surface lines of the claim, extended vertically downward, although such veins, lodes or ledges may, in their downward course, so far depart from a perpendicular as to extend outside the side lines of such surface location, such lateral rights to be confined to such portions as lie between vertical planes drawn downward through the end lines of the location.

Congressional enactments should be interpreted by the federal, rather than the state, courts, and since the decision in the *Catron v. Old Case,* the federal courts have held contrary to the holding in that case.

The case of the *Del Monte M. & M. Co. v. Last Chance M. & M. Co.,* 171 U. S. 55, 18 Sup. Ct. 895, 43 L. Ed. 72, we think, compels us to conclude that extralateral rights are conferred where the discovery vein crosses only one side line; where it crosses one end line and one side line; where it crosses the same side line twice and where it crosses neither end line; that the only exception is where it crosses both side lines. In the case of the *Del Monte M. & M. Co. v. New York & L. C. Min. Co.,* 66 Fed. 212, Judge Hallett held that such rights were conferred even though

the lode did not come to either end line.  The decision in the *Tyler M. Co. v. Last Chance M. Co.*, 71 Fed. 848, is cited with approval in the *Del Monte v. Last Chance Case supra*, and is in accord with the decision of Judge Hallett in the *Del Monte-New York Case*.

The new trial raise demonstrates that the trial court was wrong in its findings that all the lime beds between the stopes were country rock, and is most cogent evidence that solid pyrite exists to the Black Hawk vein, and shows the existence of that, or the Manganese vein, and it appears that the trial court denied defendants' motion for new trial, notwithstanding such showing, for the reason that such vein crossed the side line of the Black Hawk claim, and therefore it could not give extralateral rights.  As already suggested, such is not the law as determined in the cases cited, and also in *Keeley v. Ophir Hill* (unreported) October 7, 1907, U. S. Circuit Court, District of Utah, opinion by Marshall, J.

These cases, in brief, hold that the locator is granted the right of following all veins, the top or apex of which lies inside of his surface lines.  The presumption is that a vein continues regularly along its course, and therefore we should presume that the apex of bed No. 4 crosses the northeasterly side line of the Black Hawk claim.

We also think the court erred in its finding that there was no continuous vein from the trespass stope up to defendants' alleged Black Hawk vein, but only replacement deposits of ore and iron and therefore that No. 4 lime bed was not a lode.  We are of the opinion that the newly discovered evidence shows the contrary.  Lime beds replaced with minerals, fractured and faulted, as indicated by the evidence in this case, constitute a lode as defined in the *Eureka Case*, Fed. case No. 4548, 4 Saw. 302; *Utah Cons. M. Co. v. Utah Apex M. Co.*, 285 Fed. 249; also *U. S. Mining Co. v. Lawson*, 134 Fed. 769, 67 C. C. A. 587. In the latter case Judge Van Devanter said: "A careful examination and consideration of the evidence clearly convinces us that the stratum of limestone constitutes a single

broad vein or lode of mineral bearing rock extending from the quartzite on one side to the quartzite on the other. The limestone has been profoundly broken, altered, and mineralized, and has thereby obtained an individuality which, apart from other differences, clearly distinguishes it from the neighboring rock. There is a local absence of ore in places, a continuous occurrence of it in others, and a seeming local occurrence of it in still others, but the ore bodies are not separated, one from another, by any defined boundaries."

And the court then held that whatever may have been the mineralizing process, the alteration and mineralization of the limestone were so general, and extensive as to convert it into a single broad vein or lode. In the *Keeley v. Ophir Hill Case,* Judge Marshall observed: "Nor is the fact that the beds are but slightly mineralized between the ore shoots of prime importance. The character of the deposit being once established, and the beds, constituting the same, persisting, slight evidence of mineralization between valuable ore shoots is sufficient to prove continuity of vein."

In view of the holding in the foregoing cases, we cannot escape the conclusion that No. 4 lime bed is a continuous lode, and would, if the evidence upon another trial should be of equal force with that of the newly discovered evidence, as presented upon the hearing of the motion for new trial, be shown to come within the doctrine announced in those cases.

Notwithstanding the court's findings that the stopes were mineralized from the Allegheny vein, and are connected with it, if the Black Hawk, or Manganese vein exists as claimed by defendants, and if their theory is correct that the pyrite reaches this vein, inasmuch as they have the senior location, they would have the extralateral rights. There is no express finding by the court of the non-existence of the vein which plaintiffs call the Manganese, and defendants call the Black Hawk vein, therefore such vein may exist, and a senior location only can be followed across

the side line on the dip. "When * * * veins or lodes unite on their dip, the older location takes all the ore at the point of intersection and the whole vein thereafter." 27 Cyc. 587; *Champion Min. Co. v. Consolidated Wyoming Gold Min. Co.*, 75 Cal. 78, 16 Pac. 513; *Tyler M. Co. v. Last Chance M. Co.*, 71 Fed. 848, 852.

It is claimed that the source of mineralization determines the apex, but with this contention we do not agree. If the lime bed is a vein, and the defendants have the apex of it, senior to the Allegheny, the defendants can follow it. *Keeley v. Ophir Hill Case, supra.* It also appears to be a contention of plaintiffs that a barren vein cannot be followed into the adjoining territory, and that if ore is found by sinking on the dip of such vein the ore cannot be followed into such adjoining territory; but we think this can be done by one holding the senior location.

Whether the apex of No. 4 vein is at the Black Hawk Manganese vein, if No. 4 stops there, or whether it joins and becomes a part of that vein, and its apex is there, or whether it goes through the Black Hawk-Manganese fissure to the Quartz vein, and the apex is there, or whether it goes into the Quartz vein and its apex is there, is immaterial, for in either case the apex would belong to defendants.

In view of the conclusions reached we deem it unnecessary to pass upon the other questions presented.

For the reasons given the judgment of the court below is reversed with instructions to grant a new trial.

MR. JUSTICE ALLEN not participating.