## No. 14,148.

## Gold, Silver and Tungsten, Inc. *v.* Wallace, Executor et al.
### (91 P. [2d] 975)

Decided April 10, 1939.  Rehearing denied June 12, 1939.

Mr. JOHN R. WOLFF, Mr. HORACE N. HAWKINS, for plaintiff in error.

Mr. RALPH S. NEWCOMER, Messrs. Goss & HUTCHINSON, for defendants in error.

*En Banc.*

MR. JUSTICE KNOUS delivered the opinion of the court.

THE defendants in error, plaintiffs in the court below, were the owners and lessee of the Gray Copper lode mining claim. The plaintiff in error, defendant below, was the owner of the Fitchburg lode mining claim. The parties will be designated herein as they appeared in the trial court. Plaintiffs alleged that certain ores mined by the defendant, although lying within the lateral boundaries of the latter's Fitchburg claim extended downward, in fact, were extracted from plaintiffs' Gray Copper vein, the apex of which was within the territory covered by their claim. Plaintiffs prayed for injunctive relief, a judgment quieting title to the Gray Copper claim in them, and damages for the ore removed and injury to their workings. The answer of defendant alleged that any ore taken from beneath the surface and within the boundaries of its Fitchburg claim was from a vein which had its apex within the area of that claim. By way of cross complaint defendant asserted that through underground mining workings extending from the Gray Copper claim, the plaintiffs had entered Fitchburg territory and mined and removed ore from a vein apexing in the defendant's claim and belonging to it. An accounting of all ores allegedly so removed by plaintiffs, judgment therefor, and injunctive relief were sought by defendant.

The seniority of defendant's Fitchburg claim over plaintiffs' Gray Copper claim is admitted. The southwesterly portion of plaintiffs' Gray Copper claim overlaps in part the northwesterly portion of the Fitchburg claim. The Gray Copper patent excludes the overlapping area and as a consequence the easterly sideline of the Fitchburg claim is a common sideline between the areas of the Fitchburg and Gray Copper claims with which we are here concerned. The Gray Copper vein at its apex crosses the northerly end line of the Gray Copper claim and extends in a general southwesterly direction on that claim between the sidelines thereof along a course which is substantially parallel thereto to a point near the intersection of the easterly sidelines of the two claims, where

the vein departs from the Gray Copper claim. The apex of the Fitchburg vein, as involved in this controversy, lies very near the easterly sideline of that claim, and runs approximately parallel to the apex of the Gray Copper vein, about 60 feet westerly therefrom, with the common sideline between the two apices.

The plaintiffs' Gray Copper claim was first developed by a series of shafts sunk from its surface area. Later the Gray Copper vein below the bottom of these shafts was opened and developed approximately 300 feet beneath the surface by means of a horizontal drift known as the Nancy tunnel, about which stopes or raises were made on the vein and connected with the shafts which previously had been sunk from the surface. The defendant's group of claims, of which the Fitchburg was one, had been developed through the Wood Mountain tunnel, the portal of which is located west of the area in conflict and which intersected the Fitchburg ground at a depth of about 500 feet below the surface, and was the defendant's only workings on the Fitchburg at the time this controversy arose. In these prior operations the Gray Copper vein produced a considerable amount of marketable ore; the Fitchburg none. In the fall of 1931 plaintiff Scruggs leased the Gray Copper claim, and in the course of his operations drove a drift from the Nancy tunnel on the Gray Copper vein across the Fitchburg sideline into the defendant's Fitchburg claim to an intersection with the vein therein, here in controversy, where an ore body was encountered and from which a considerable amount of ore was shipped. Upon learning of this work within the vertical boundaries of its Fitchburg claim, defendant made certain investigations and surveys and in 1933 notified plaintiff Scruggs that he was trespassing on the Fitchburg vein. Scruggs, however, claimed that the vein upon which he was working was the Gray Copper vein which on its dip had crossed the sideline of the Fitchburg property. In August, 1934, largely to determine the identity of the vein in the area in conflict, the defendant started to sink the Fitchburg

shaft on the Fitchburg vein at the surface and continued this shaft to a depth of about 200 feet, where it encountered a flat of intrusive material which apparently cut off the downward course of the vein. A crosscut was then extended from this shaft to the disputed vein and ore body, and a lateral drift was driven on the vein 70 feet southwest and 33 feet to the northeast to define its course and strike. In January, 1935, Scruggs, who had continued to operate, shipped two carloads of ore from the disputed area to the Golden Cycle mill, upon which, by application of defendant, settlement was withheld. Later by stipulation of the parties the proceeds from this ore were deposited with the clerk of the district court of Boulder county to abide the judgment. Defendant likewise continued with the work through drifts and crosscuts from the Fitchburg shaft, in the progress of which some ore was removed by it, and in October, 1935, this suit was instituted by plaintiffs.

At the first trial plaintiffs contended that the disputed vein, which they designated the West Branch of the Gray Copper vein, was a split from their discovery vein which in its downward course had dipped across the Fitchburg sideline into the disputed area, from whence it continued downward and reunited with the main Gray Copper vein at a point or points in the vicinity of the Nancy tunnel level. The junction below of the disputed vein and the Gray Copper discovery vein is not in serious controversy. The plaintiffs also alleged that the main Gray Copper discovery vein on its dip crossed the Fitchburg sideline into the disputed territory. Upon this premise they asserted extralateral rights and so justified following the vein into Fitchburg territory. U. S. C. A., Title 30, §26, U. S. R. S., §2322; *Rico-Argentine M. Co. v. Rico Con. M. Co.*, 74 Colo. 444, 223 Pac. 31. The defendant, on the contrary, contended that the main Fitchburg vein and the disputed vein were correlated by a series of footwall branch veins forking from the Fitchburg discovery vein which continued downward and united with the disputed vein; that the

area between the Fitchburg vein and the disputed vein, through which these branch veins were alleged to pass, was really a mineralized zone legally constituting a broad lode connecting the two; that the disputed ore body and vein was made by the junction of these footwall branches and mineralized zone therewith, and that the Fitchburg vein was the controlling apex for its branches. Defendant further asserted that even if the vein in dispute was a split from the Gray Copper discovery vein, nevertheless, by virtue of the seniority of the Fitchburg claim, defendant was entitled to the whole vein downward from the point of union of the highest Fitchburg branch vein therewith under the applicable federal statute. U. S. R. S. §2336, U. S. C. A., Title 30, §41.

After an extended trial the district court orally announced its findings to the effect that plaintiffs' West Branch vein was a split from the Gray Copper discovery vein and upon the basis of the upward declination of the vein as exposed in certain crosscuts driven from the Fitchburg shaft projected to the surface, concluded that said West Branch vein did not apex within the Fitchburg surface area and said the evidence indicated that its apex was within the surface boundaries of the Gray Copper claim at or near the outcrop of the discovery vein. The court further found that the Fitchburg vein, neither by absorption nor through its alleged footwall branches, made any connection with the West Branch vein.

During the progress of the first trial and in the period allowed for filing motion for new trial, the defendant, had proceeded with its exploration through workings driven from the footwall side of the Fitchburg shaft and in due course filed a motion for a new trial based upon evidence newly discovered in these operations. In the affidavit supporting the motion it was alleged that workings on the disputed vein, at this point said to be a mere veinlet, from or adjacent to a drift driven from the Fitchburg shaft (44 foot level) had disclosed a pegmatite flat where the vein entirely ended and ceased. Defendant asserted that

this revelation fixed the highest terminal point of the vein, in effect a blind apex, as being within the lateral boundaries of the Fitchburg claim, extended downward, thus discounting the court's announced conclusion and establishing defendant's right to the vein. Among other matters it was further set out in the affidavits that the extension of another crosscut from the Fitchburg shaft on the 110 foot level showed in its breast a union of the Fitchburg vein with the disputed vein. Defendant claimed that this development demonstrated the soundness of its original contention in this respect and by virtue of the priority of the Fitchburg claim, in any event, entitled it to the vein below the point of the union. At the request of both parties the trial court inspected the premises and after hearing arguments, granted the motion for new trial on the ground of newly discovered evidence.

At the conclusion of the second trial the court found that the vein in dispute did not terminate at the flat in the 44 foot level, but continued to the surface and apexed within the Gray Copper claim. The findings further were to the effect that at the locus mentioned there was an intersection, *but not a union,* of a Fitchburg vein and the vein in controversy. Thereafter, considering the evidence introduced in both trials, the court formally found all of the issues generally in favor of the plaintiffs and against defendant, but, in accordance with section 2336 U. S. R. S., awarded to defendant the ore within the space of intersection of the veins mentioned. Judgment was entered accordingly and defendant's cross complaint dismissed. Defendant here seeks a review of the judgment as to the matters adjudicated.

The bill of exceptions comprises in excess of 50,000 words and, in addition, numerous exhibits, including elaborate models, which were offered in evidence by the parties in the course of the proceeding. Much of the testimony comes from expert witnesses and, as often is the case, the evidence of the corps appearing for the respective parties, not only as to opinions expressed but on

factual subjects as well, is in substantial conflict. The trial court aptly remarked concerning the expert witnesses: "One sees it and one does not see it; one sees it one way and another sees it another." The exploration work by the parties made feasible a visual inspection of much of the underground structure, ordinarily a matter of conjecture and projection, in cases of this character. By reason of this circumstance the inspection of the premises by the trial judge accorded him an opportunity, we must asume, properly availed, to better understand, apply and weigh the evidence adduced, especially such as related to the physical aspects of the formation and veins in conflict, than would be possible from hearing, to say nothing of merely reading, the testimony.

It is well said in 2 Lindley on Mines (3d ed.) p. 1470: "The legal identity or continuity of a vein on its downward course, as well as on its longitudinal course underneath the surface of adjoining lands, presents at times the most serious questions encountered in the administration of the mining law. It is impossible to prescribe any definite rule as to what degree of continuity or identity in a legal sense the miner must establish when he invades property adjoining the location containing the apex of the vein. Each case presents its own peculiar features." Presumptively the patentee of a mining claim is the owner of all ore found under his surface and the burden of proof to the contrary is on the extralateral claimant. *Liberty Bell G. M. Co. v. Smuggler-Union M. Co.*, 203 Fed. 795, 122 C. C. A. 113; *Iron Silver M. Co. v. Campbell*, 17 Colo. 267, 29 Pac. 513. To avoid the conclusive effect on review of the findings of the trial court on conflicting evidence, counsel for defendant present ingenuous argument designed to convince that on salient points there was no disagreement in the facts. Notwithstanding this, however, our examination of the record discloses to our satisfaction that with respect to the primary questions the evidence of the parties is in direct opposition. As illustrative of the basic conflict in the evidence, we first refer

briefly to the testimony relative to the defendant's contention that the Fitchburg vein forked on its footwall side in its downward course; that these downward forks and branches united with the disputed vein; and that the latter thereby became correlated and part of the main Fitchburg vein, either by this union or through the alleged mineralized belt lying between the two veins. The evidence unmistakably discloses that much of the zone intervening between the Fitchburg vein and the vein in dispute is broken by fractures forming joint planes which contain carbonates. These fractures likely were caused by an adjacent intrusive dike which also may be responsible for the diverse courses of the principal veins on both the Fitchburg and Gray Copper claims. The extent, character, size and mineralization of these carbonate seams, and whether they or any of them have a defi..ite continuity between the two veins, are matters of definite dispute between the witnesses. The defendant's theory, substantiated by the testimony of its witnesses, was that these carbonates were in reality branch veins from the main Fitchburg vein which connected with the vein in dispute, and upon the basis of assays from channel samples its witnesses said these so-called branch veins, as well as the mass of carbonates in the fractured area, were mineralized. Plaintiffs' contention, supported by their witnesses, was that the defendant's so-called branch veins were merely carbonate stringers created by descending solutions; that they were not mineralized and made no continuous connection between the two veins. The witnesses for plaintiffs based their conclusions as to the non-mineral character of the carbonate matter upon what defendant calls an ''eye'' examination with an ordinary magnifying glass.

The conflict of evidence with respect to the mineralization of this area is not avoided by defendant's contention that its evidence on this score, having been based on fire assays as contrasted with mere visual inspection of plaintiffs' witnesses, should be deemed conclusive,

since the different method of arriving at the opinions expressed merely goes to the weight of the evidence. Further, it may be noted that the mineralization or lack of mineralization of the seams claimed to be veins, while a factor which may enter into the determination of the ultimate question, is not controlling with respect to the alleged continuity of the Fitchburg vein through this fractured zone. *Iron Silver M. Co. v. Cheesman,* 116 U. S. 529, 6 Sup. Ct. 481, 29 L. Ed. 712.

During the course of the trials defendant drove a continuous raise upon what it calls the Number One Footwall Branch from the disputed vein to a connection with a crosscut disclosing the Fitchburg vein. A flat pegmatite dike was encountered in this operation. Plaintiffs' witnesses assert that the continuity of this branch vein was broken and the vein cut off by this flat before junction with the vein in dispute. Defendant's experts stated that the branch vein was continuous down to the pegmatite flat, with a width of from three to eight inches; that it then followed along the flat for a distance of five feet with a width of one and one-half inches; then went through the flat with a width of from four to seven inches, and continued down to a union with the disputed vein. The definite factual conflict on this question is made obvious when it is borne in mind that in this area the formation involved was open to actual visual inspection, and yet, notwithstanding this circumstance, the witnesses were unable to agree upon the physical characteristics of the structure. This disagreement, while relating to but a single phase of the controversy, is common with respect to all of the major points involved and is specifically mentioned as being illustrative of the general conflict in the evidence As to whether there was a vein or no vein; continuity or no continuity; connection or no connection, are essentially questions of fact. *Iron Silver M. Co. v. Mike & Starr Co.*, 143 U. S. 394, 12 Sup. Ct. 543, 36 L. Ed. 201, 17 Min. Rep. 436.

By the findings and judgment made and entered

at the end of the second trial the district court unequivocally found that there was no union of the so-called footwall branches from the Fitchburg vein with the vein in controversy, and that there was no absorption of the latter by the former through any mineralized zone or otherwise. Instead of there being a *union* of any part of the Fitchburg vein with the vein in dispute, the court affirmatively found that there was an *intersection* and concluded that the veins again diverged after the intersection. As has been mentioned, the court properly awarded the ore at the space of intersection to the Fitchburg by reason of its seniority. It has long been the rule in this jurisdiction that fact findings of the trial court based on substantially conflicting oral evidence and not unwarranted as a matter of law, are almost universally regarded as binding on the appellate court. *Mosquito Gold Mines, Inc. v. London-Butte G. M. Co.,* 96 Colo. 536, 45 P. (2d) 175; *Protheroe v. Bonser,* 94 Colo. 95, 28 P. (2d) 807. If there is evidence which upholds the findings, they will not be disturbed on the ground of insufficient support, simply because there is other evidence which, if accepted, warrants findings the other way. *Williams v. Miller,* 93 Colo. 541, 27 P. (2d) 502. This is true even though the reviewing court might have concluded differently had it been passing upon the facts in the first instance. *Jones v. Milliken,* 96 Colo. 279, 42 P. (2d) 467.

Nor can it be said with respect to the phase of the case under consideration that the findings of the court were unwarranted as a matter of law. As has been mentioned, positive testimony was given to the effect that there was no union between the so-called Fitchburg footwall branches and the vein in dispute. Likewise, there is evidence to the effect that at the point where the court determined there was an intersection, the veins stood side by side, with the identity of the matrix of the two clearly defined and clearly different as to characteristics. There also was evidence to the effect that the two veins had distinct walls. There likewise was evidence to the effect that

the zone between the two veins was not mineralized and that this zone did not have the characteristics of a lode. It has been held that a zone formation impregnated with mineral does not constitute a continuous lode. *Hyman v. Wheeler*, 29 Fed. 347, 15 Min. Rep. 519. This is especially true where the mineral in the zone is contained in true fissures therein. *Mt. Diablo M. & M. Co. v. Callison*, Fed. Case No. 9886, 5 Sawyer 439, 17 Fed. Cas. 918, 9 Min. Rep. 616. On the other hand it has been adjudged that a belt of porphyry containing mineralized seams is a lode. *Book v. Justice M. Co.*, 58 Fed. 106, 17 Min. Rep. 617. A broad zone of mineral bearing rock with streaks of mineral and barren spaces was held to be a lode in *United States M. Co. v. Lawson*, 134 Fed. 769, 67 C. C. A. 587. An examination of these authorities discloses that the divergent conclusions reached, resulted solely from the factual situation presented by the evidence in each, and in the case before us, upon this basis, it cannot be said that the trial court, under the evidence, was not warranted in reaching the conclusion which it expressed.

Likewise analogous, is the conflict of the evidence with reference to the situs of the apex of the disputed (West Branch) vein. It will be recalled that defendant claimed this vein had a blind apex in a pegmatite flat near the 44 foot level of the Fitchburg shaft and within the vertical boundaries of that claim. After defendant's assertion that its work had established this condition, the plaintiffs made an opening from the surface down to the pegmatite flat, and their witnesses testified that therein the vein is revealed as proceeding through the pegmatite flat to the surface where the apex and strike are shown by open cuts within the Gray Copper claim. Defendant's witnesses contended that what the plaintiffs call the vein from the pegmatite flat up was a mere fracture in the formation, a barren seam with barren rock, and expressed the opinion that the real top or apex of the vein was in defendant's ground immediately below the flat mentioned. As was the case concerning the footwall branch contro-

versy, the testimony of the witnesses for the opposing parties was directly conflicting as to the mineral character, size and general characteristics of the questioned vein and as to whether it was in fact disclosed in the open cuts on the surface of the Gray Copper property. Defendant further argues that the seam, as its witnesses designate it, about the flat, did not have sufficient of the characteristics of the real vein to give extralateral rights to plaintiffs. To confer extralateral rights a vein need be continuous only in the sense that it can be traced by the miner through the surrounding rock. Slight interruptions of the mineral bearing rock are not alone sufficient to destroy the identity of the vein, nor would a short partial closure of the fissure have the effect to destroy the continuity of the vein if a little farther on it appeared or recurred again containing mineral bearing rock. *Iron Silver M. Co. v. Cheesman, supra; Cheesman v. Shreeve,* 40 Fed. 787; *Daggett v. Yreka M. & M. Co.,* 149 Cal. 357, 86 Pac. 968. The trial court resolved this question in favor of the plaintiffs. Its finding in this respect had the effect of establishing the apex of the disputed vein within the area of the Gray Copper claim and renders futile defendant's extended discussion of the legal principles which might be applicable if the vein in conflict had a blind apex within the vertical boundaries of the Fitchburg claim.

Counsel for defendant generally predicate much of their argument upon certain expressions in the oral findings of the court made at the conclusion of the respective trials, and assert that some of these remarks are inconsistent with the ultimate formal findings incorporated in the judgment and decree. While it may be that in two or three isolated instances technical incongruities may be detected, when the entire oral statement under consideration is scrutinized the effect of these so-called inconsistent observations largely vanish, and may be attributed to misadvertence in expression, so difficult to avoid in the oral discussion of technical subjects. How-

ever, in no event are we concerned with the reasoning by which the court below arrived at its ultimate conclusions which are clearly and unambiguously stated in the formal findings and decree. As we stated in *Stough v. Reeves,* 42 Colo. 432, 95 Pac. 958, quoting from *Burke v. Table Mountain Water Co.,* 12 Cal. 408: " 'The reason given for the conclusion is not res judicata as to him, so as to bind him in any future proceeding. * * * We do not understand that the reasons given for a judgment are' judgments. The point decided is the thing fixed by the judgment, but the reasons are not'." While the rule last mentioned makes unnecessary the consideration of the oral remarks of the trial court to which reference has been made, we may in passing say that we cannot give to certain of the trial court's statements the effect contended for by the defendant. In commenting upon the evidence the court in effect said that the West Branch vein above the flat in the 44 foot level would not be sufficient to validate a discovery of that vein. Defendant, under the authority of *Golden v. Murphy,* 31 Nev. 395, 105 Pac. 99, and *Mammoth M. Co. v. Grand Central M. Co.,* 213 U. S. 72, 29 Sup. Ct. 413, 53 L. Ed. 702, asserts that if the vein was not sufficient to validate a discovery, it was wholly inadequate to confer extralateral rights. Our perusal of the court's remarks indicate that its purpose in making the statement mentioned was to accentuate the inapplicability of the principle announced in those cases to the factual problems presented by the case at bar. The court had determined, and there seems to be little question upon the point, that the disputed vein united below with a branch of the Gray Copper discovery vein to which plaintiffs were entitled, unless deprived of this right by the split upward of the disputed vein. In other words, here the ultimate question on this issue was whether the plaintiffs lost their extralateral rights by virtue of the West Branch vein, rather than whether that vein conferred upon them extralateral rights. In the light of this situation the upward continuation of the vein to the surface was pertinent

principally as establishing that the disputed vein was in fact no part of the Fitchburg vein and had an apex without the Fitchburg boundaries. On review, the record must be viewed in the light most favorable to the party successful in the trial court and every inference fairly deducible from the evidence is drawn in favor of the judgment. *Hiner v. Cassidy,* 92 Colo. 78, 18 P. (2d) 309; *Roberts v. Deitz,* 88 Colo. 594, 298 Pac. 1062. Upon this basis we are satisfied that we would not be justified in setting aside the findings and judgment of the trial court.

Defendant further contends that plaintiffs' complaint pertained solely to the Gray Copper discovery vein and did not allege a trespass upon, or an adverse claim to, the West Branch vein, as a consequence of which they urge that in quieting title to that vein in the plaintiffs the judgment was erroneous in that it goes beyond the cause of action pleaded and the issues joined thereunder. While we believe the pleadings themselves clearly are sufficient to warrant the adjudication made and relief granted, under the situation disclosed by the record, we need not enter into a detailed discussion of the point since that question was not raised until motion for new trial was filed, and defendant made no objection to the evidence relating to the West Branch vein when presented on the ground that there was a variance between the proof and pleading in this connection or a departure from the former. It is apparent from the record that from the beginning to the conclusion of the two trials the question of the ownership of the West Branch vein was bitterly contested and without restraint, restriction or limitation, both parties offering evidence in support of their respective theories on this issue. It is obvious under these circumstances that the suggested variance, even if it existed, did not affect the substantial rights of the defendant and, hence, cannot be made grounds for reversal. Code of Civil Procedure, §84; *Otis & Co. v. Teal,* 74 Colo. 336, 221 Pac. 884. Further, in such case the failure of defendant to object to the evidence on the ground of variance

amounts to a waiver of the point, since if the pleadings were insufficient, an amendment no doubt would have been allowed under code section 84, supra. *Hiner v. Cassidy, supra; Rice v. Franklin L. & F. Co.,* 82 Colo. 163, 258 Pac. 223; *Perkins v. Russell,* 56 Colo. 120, 137 Pac. 907; *Tew v. Powar,* 37 Colo. 292, 86 Pac. 342.

The judgment is affirmed.

MR. CHIEF JUSTICE HILLIARD dissents.

MR. JUSTICE FRANCIS E. BOUCK and MR. JUSTICE BOCK not participating.

The following dissenting opinion was filed June 12, 1939.

MR. CHIEF JUSTICE HILLIARD dissenting.

I am unable to agree with my associates in their reasoning or conclusions in the disposal of this case. The judgment of affirmance, and the opinion upon which it is founded, will, I am convinced, leave titles to mineral lands and rights of property open to attack and overthrow upon surmises and conjectures. Such titles and property rights acquired under the mineral laws should not be left subject to uncertainties, because they rest upon the word of the government, the grantor in all mineral patents.

It appears that defendants in error, who are the owners and in possession of the Gray Copper lode mining claim, sued plaintiff in error to enjoin removal of ores from a vein which is within the extended area of plaintiff in error's Fitchburg lode mining claim, for an accounting of ores removed, for judgment quieting title to the mineral land in controversy in them, for damages and costs. Plaintiff in error in answer to the action, besides denying the right of defendants in error to possession of the premises, filed a counterclaim setting up, inter alia, that it is the owner and in possession of the Fitchburg claim, the senior location and patent; that it is the owner of and entitled to all veins apexing within the extended surface limits of the Fitchburg claim, including the vein or lode from which the

ore in question was taken by defendants in error. Plaintiff in error prayed that defendant in error's claim be adjudged invalid, because of the foregoing alleged facts, for injunctive relief and for an accounting. After the trial plaintiff in error's counterclaim was rejected by the court and judgment was rendered for defendants in error, based upon an elaborate finding of facts.

I am not unmindful of the grave responsibility that attaches to the final decision of a case of the magnitude and importance of this cause, now here for determination. I have come to the conclusion that defendants in error had no right whatever to invade the vertically extended limits of plaintiff in error's Fitchburg claim. My examination of the record discloses to my complete satisfaction, and the conclusion is irresistible, as I conceive, that defendants in error unlawfully appropriated plaintiff in error's property. That unlawful appropriation consisted, as I read the record, of the extraction by defendants in error of ore to the value of thirty thousand dollars from plaintiff in error's Fitchburg claim. This was done from the workings of defendants in error within the boundaries of their Gray Copper claim 277 feet below the surface. There was no opening to the surface from plaintiff in error's claim where defendants in error extracted the ore; therefore, defendants in error were trespassers. A party has no right to tunnel through another's patented ground to cut a vein which apexes within the boundaries of his own claim. *St. Louis M. & M. Co. v. Montana M. Co.,* 113 Fed. 900, affirmed 194 U. S. 235; 2 Lindley on Mines (3d ed.), p. 1470, §615. "The presumption, where a miner is found beyond his sidelines, is against him. He is prima facie a trespasser till he has shown that he gets there by following the lode on its dip from its apex within his lines." Morrison's Mining Rights (16th ed.) p. 218. See *Iron Silver M. Co. v. Campbell,* 17 Colo. 267, 29 Pac. 513. He must proceed downward from the surface within his own lines and not through the "back door." The admonition laid down by the United States Supreme Court in *Jim*

*Butler Tonopah M. Co. v. West End Con. M. Co.*, 247 U. S. 450, 460, is enlightening, in this: "It is well to remember * * * that to take from the discoverer a portion of that which he has discovered and give it to one who may have been led to make an adjoining location by a knowledge of the discovery is unreasonable." That, in my opinion, is precisely what has resulted here. Defendants in error, the apex and extralateral claimants, had the burden of proving beyond reasonable controversy, all the geological facts which are required to establish their full compliance with sections 2320, 2332, and 2336, U. S. Revised Statutes. The burden of proof never shifted, it was plaintiffs' throughout the entire proceeding. *Cheesman v. Hart*, 42 Fed. 98; 3 Lindley on Mines (3d ed.), §866, p. 2163, et seq. They were even precluded by law from stipulating as to these facts. The California Court of Appeals in *Garibaldi v. Grillo*, 17 Cal. App. 540, 542, 120 Pac. 425, 426, discoursed upon the law at length holding: "The parties were competent to stipulate as to their contending and conflicting rights, but they could not by stipulation relieve themselves from proving at the trial that they had made a discovery of gold * * *, as contemplated by the laws of the United States (*Chrisman v. Miller*, 197 U. S. 313 [25 Sup. Ct. 468, 49 L. Ed. 770])." The court then quoted with approval the rule emphasized in *Chrisman v. Miller, supra*, relating to a discovery and vein definition, in this: " 'There must be such a discovery of mineral as gives reasonable evidence of the fact, either that there is a vein or lode carrying the precious mineral, or if it be claimed as placer ground, that it is valuable for such mining.' The court quotes the definition given by the United States land department as follows: 'Where minerals have been found, and the evidence is of such a character that a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine, * * *'." See, also, 2 Lindley on Mines (3d ed.), p. 763. Tested by these principles, I think the

learned trial court was not warranted in holding that defendants in error's evidence met the statutory requirements.

The first point that claims my attention is that the trial court erred, as I think, in finding that the evidence established the apex of the disputed vein to be within the area of the Gray Copper claim. In finding that defendants in error had proved beyond reasonable controversy, as they were required to do to meet the mandatory terms of the statute, that the area of the mineral land in dispute apexed within the surface limits of defendants in error's Gray Copper claim and conferred extralateral rights on them, did the trial court rightly resolve? I think not. The court opinion here sustaining the trial court's finding and decree on this particular question, as well as other questions mentioned in the opinion, to which I shall refer, states that the testimony of the witnesses was directly conflicting. I do not so read the evidence. I understand the law to be that no conflict of evidence could be raised by testimony on this question until the witnesses for the respective parties gave opposing testimony upon the question of the geological facts necessary to meet the requirements of the statute. I am satisfied from a critical examination of the record on this question that defendant in error's witnesses did not even mention the geological facts, that is, a true discovery and vein apex, necessary to meet the positive requirements of section 2320, U. S. Revised Statutes (U. S. C. A., Title 30, §23): " * * * no location of a mining claim shall be made until the discovery of the vein or lode within the limits of the claim located." The word discovery means that a vein exists. *Mason v. Washington-Butte M. Co.,* 214 Fed. 32, 35, 130 C. C. A. 426.

The statement in the court opinion here "that the disputed vein united below [no doubt meaning the vein in dispute] with a branch of the Gray Copper discovery vein to which plaintiffs were entitled," is not, as I conceive, supported by the evidence. In fact the contrary is made

conclusively to appear from the record as I understand it. Defendants in error had no right to "the vein below" unless they could establish, beyond reasonable controversy, that the vein in dispute apexed within the surface boundaries of their Gray Copper claim and that it did not connect with the Fitchburg vein.

In determining what constitutes a discovery that will satisfy the law within the definition of the terms vein or lode, the tendency of the courts is toward liberality of construction until the miner asserts rights in property which prima facie belongs to someone else. 2 Lindley on Mines (3d ed.), p. 765, §336. What constitutes a discovery that will validate a location may be wholly inadequate to justify the assertion of extralateral rights under the statutes. *Grand Central M. Co. v. Mammoth M. Co.*, 29 Utah 490, 576, 83 Pac. 648. I am convinced from the record that there is no vein whatsoever extending up from the flat below the 44 foot level, in the Fitchburg claim to the surface. The only connection referred to is merely a fracture in the rock of the mountain. Moreover, I believe that even this fracture is not continuous in its extent from the flat upwards to the surface within the boundaries of the Gray Copper claim. The proof seems conclusive that it is a broken fracture, a joint plane, as expert testimony shows, and as is illustrated by defendant's plates 8 and 9, which plates, as I read the evidence, are the product of and corroborated by the testimony of the learned geologist R. B. George. The physical condition shown by these plates and plaintiff in error's testimony as to assays made by it is not in material conflict with the testimony of defendants in error's witnesses. This is clear to me because the testimony of defendants in error's witnesses does not prove or tend to prove the geological facts required by the mining laws to establish a valid location. These witnesses did not assay the alleged vein. The value of the testimony of experts as to what constitutes a vein or lode depends to a great extent upon the strength or weakness of the reasons given in support of the conclusions reached. *Book*

*v. Justice M. Co.*, 58 Fed. 106, 109. Defendant in error's witnesses gave no reasons; they presented no assays. Their mere statements without basic reasons for the conclusions reached are inadequate. In further reviewing the evidence upon this question, I find that the record discloses that defendants in error did not present any evidence at the first hearing to prove the geological facts required to establish a discovery and a vein apex within the surface limits of their Gray Copper claim, which in its downward course they alleged junctioned with the disputed area. At the second hearing defendant in error's witnesses Byron and Worcester testified upon this question. The witness Byron stated that it was not required to have values in the vein in excess of the surrounding country rock and that the vein or fracture may be entirely barren. This witness also stated that no assays were made by him of this so-called vein and that no quartz appeared in the vein or fracture. The witness Worcester testified that a vein could exist without any mineralization and that no assays were made by him of the alleged vein. This was not sufficient proof to meet the requirements of the law, as pronounced by controlling decisions, nor to raise any conflict in the evidence on this important question, in view of the testimony of plaintiff in error's witnesses and the assays made by them. I think it is directly contrary to the imperative requirements of the law. It was incumbent upon defendants in error to prove a vein apex more substantially than would have been required to sustain a discovery. It is a well established rule of mining law, as I understand it, that stronger proof is required to support a claim of apex conferring extralateral rights, than would be required to prove a valid lode location. This rule is emphasized in *Grand Central M. Co. v. Mammoth M. Co., supra,* wherein it is said: " * * * What may constitute a sufficient discovery to warrant a location of a claim may be wholly inadequate to justify the locator in claiming or exercising any rights reserved by the statutes. What constitutes a discovery that will validate a

location is a very different thing from what constitutes an apex, to which attaches the statutory right to invade the possession of and appropriate the property which is presumed to belong to an adjoining owner." The writ of error from the United States Supreme Court was dismissed. 213 U. S. 72. Plaintiff in error was right in its contention that the seams or fractures above the flat did not have the statutory characteristics of a real vein required to confer extralateral rights on defendants in error.

I am convinced that the discovery and vein apex alleged to exist within the surface limits of defendants in error's mineral land is shown by the evidence to be counterfeit, sham. "While the courts may be unable to define with sufficient accuracy for all purposes what is necessary to constitute a discovery, they may have no difficulty in discriminating between the genuine and the counterfeit, the real and the sham." 2 Lindley on Mines (3d ed.), p. 772, §336.

The court opinion here, in holding that "the testimony of the witnesses for the parties was directly conflicting" upon this question, is not justified, as I read the whole evidence, for the testimony of defendants in error's witnesses did not prove or tend to prove the geological facts necessary to establish a discovery, within the requirements of the law, as I believe I have shown. I am not in accord with this holding of the court. It is wrong as a matter of law, as I understand. The rule is well established that where an apex claimant fails to prove, beyond reasonable controversy, a discovery having a body of mineral bearing rock therein sufficient to meet the requirements of the statute, then the question whether a vein exists that would confer extralateral rights, becomes a question of law and not of fact. My analysis of this question involved consideration of what constitutes a vein or lode and under what circumstances of continuity and of interruption a vein may be followed in the surrounding rock so that its identity is preserved. If it is not continu-

ous (aside from slight interruptions), or if it is not found in a crevice or opening which is itself continuous, it can not be called by that name. A mere barren fracture in the rock, or just an opening is not sufficient. *Bryan v. McCaig,* 10 Colo. 309, 313, 15 Pac. 413. It must be filled with vein matter, which must carry values in excess of the surrounding country rock. *Golden v. Murphy,* 31 Nev. 395, 103 Pac. 394; *Grand Central M. Co. v. Mammoth M. Co., supra,* and cases cited. It is well settled that slight interruptions of the mineral bearing rock alone would not be sufficient to destroy the identity of the vein; nor would a short partial closure of the fissure have that effect, if a little beyond it recurred again with mineral-bearing rock within it. It is clear, as I understand, that whether a vein exists is a question of fact. It is obvious, however, that this fact can only be determined by proof of other geological facts; that is, first, a discovery of mineral in place; and, second, the existence of mineral in sufficient quantities to justify a prudent person in the expenditure of his time and money. If the proof fails to establish either of these geological facts, then a vein does not exist, as a matter of law. It follows as corollary that the contra obtains where the proof establishes these geological facts. This rule, as I view it, is elementary and is unanimously supported by authoritative decisions of state and federal courts. *Chrisman v. Miller, supra; Beals v. Cone,* 27 Colo. 473, 486, 62 Pac. 948; *Bryan v. McCaig, supra; Harper v. Hill,* 159 Cal. 250, 113 Pac. 162, 166; 2 Lindley on Mines (3d ed.), §336. Defendants in error's proof in this case failed to establish any of the geological facts required to show that a vein existed at this point. The admissions of defendants in error's witnesses that they had not made a discovery of mineral and had no knowledge of the existence of any of the precious minerals named in the statute in the questioned vein structure did not create a conflict in the evidence, because the witnesses for plaintiff in error proved by actual assays that there was no mineral contained in the questioned vein in excess of the surround-

ing country rock. I am convinced that the trial court based its finding as to this question upon a false definition. It is obvious that in resolving in favor of defendants in error, the court virtually defined a mere barren fracture in the rock of the mountain as a vein. This was gravely wrong, as I conceive, and the error is reflected in the judgment.

The court opinion makes much of the contention that the findings of fact of a trial court are binding on a court of review. The opinion cites former holdings of this court to the effect "that the reasons given for a judgment are not judgments." With this rule, generally, there can be no serious controversy. However, there are notable exceptions, and this case presents a typical instance. In *Thuringer, Admr. v. Trafton,* 58 Colo. 250, 144 Pac. 866, we said: "The finding of a trial court is not necessarily binding on a court of review when it clearly appears from the *whole* record that such finding is wrong." The court broadened the rule in *Neelley v. Farr,* 61 Colo. 485, 516, 158 Pac. 458, where we said: "But to this rule there are well recognized exceptions, as where the finding is the result of * * *, mistake or misapprehension, or misconception of the legal effect of the evidence; * * *." Moreover, in *Mammoth M. Co. v. Grand Cent. M. Co.,* 213 U. S. 72, Mr. Justice Holmes, speaking for the court, said: "Of course, if these findings rest on a false definition they may have to be reconsidered, and cannot be assumed to be correct." I am convinced that since it is clear that the trial court in this case based its findings upon numerous false definitions, its findings cannot be assumed to be correct, and should be reconsidered.

The second point that claims my attention is that the trial court erred in finding that there was no union of the footwall branches of the Fitchburg vein with the vein in controversy. The testimony of the witnesses for the respective parties in relation to this particular phase of the case has had my critical attention.

It is obvious that one of the ultimate questions to be de-

termined from the evidence in this case, involving elementary principles of mining law is: Do these branch veins of the Fitchburg exist and unite with the disputed vein? If so, then this disputed vein, as a matter of law, belongs to plaintiff in error irrespective of any other veins or fractures that might apex in defendants in error's ground. Did the trial court err in resolving this question in the negative? I am convinced that it did. That finding, as I believe, is the result of mistake and misconception of the legal effect of the evidence. In that view, as the authorities hold (already cited), it is our office to examine anew.

It seems conclusive, as I read the whole evidence, that the Fitchburg vein split in its downward course and formed branches which unite with the vein here in controversy. It is asserted by defendants in error, and the trial court found, a finding approved here, that this branch No. 1, and similar branches of the Fitchburg vein, are merely a series of "stringers" and do not unite with the vein in dispute. However, defendants in error's expert witness Worcester, the only witness to give testimony in reference to this vein, admitted, on cross examination that a "stringer" is a vein. He said, "If you got down to minute sizes, of course, they are all veins because there is no maximum or minimum for size of a vein that I know of."

I do not agree with the statement in the opinion that the extent, character, size, and mineralization of the carbonate seams (really the branch veins) are matters of definite dispute between the witnesses of the parties. The testimony of defendants in error's witnesses does not include even a reference to the geological fact required to establish that the branch vein (carbonate seams, as defendants in error's witnesses characterizes them), did not contain mineral in appreciable quantities or that the veins could not be traced in the surrounding rock. The opinion of the court says that the formation involved in and about these branch veins was open to actual visual

inspection, and that still the witnesses did not agree upon the physical characteristics of the structure. It is obvious from a critical study of the geological facts in evidence, involving such varied features, that it is but natural that the witnesses should differ in their conclusions.

It was incumbent upon defendants in error to establish as a geological fact that these branch veins were not mineralized and that they were not continuous from the Fitchburg vein to the disputed vein. In fact, defendants in error's witness admitted that the No. 1 branch vein was mineralized and that there was only a slight interruption in continuity; further, that the offset which caused the interruption was mineralized. As I see, defendants in error's evidence alone entitled plaintiff in error to judgment upon this question. But to go further in reviewing the evidence, plaintiff in error proved conclusively that an ore body, varying in width from one to six inches, having an average value of $7.43 a ton, is continuous from the Fitchburg vein down to its union with the vein in dispute, from which defendants in error extracted the ore. It is indisputable that this evidence was not controverted by defendants in error. Therefore, there is no "factual conflict" upon this question. The trial court's finding that this ore body was a "stringer" is a false definition and "should be reconsidered, and cannot be assumed to be correct." It is in effect a holding that a continuous body of ore does not constitute a vein. This was grave error, and as I have said about other false definitions, is reviewable by us.

It seems clear from the court opinion, that the court approves opposite positions in applying the elementary principles of mining law to the facts relative to vein continuity. First, it approves the trial court's finding based on defendants in error's evidence, that a purported slight interruption in the Fitchburg footwall branch No. 1 vein of only five feet, caused by the intrusion of a pegmatite dike, although mineralized, cut off the vein and destroyed its continuity. Second, it approved the finding that a

total interruption or cutting off of the disputed vein by the pegmatite flat near the 44 foot level in the Fitchburg claim, did not interrupt the continuity of the vein to the surface of the Gray Copper claim, a distance of about fifty feet. The court opinion here says in regard to this last question: "To confer extralateral rights a vein need be continuous only in the sense that it can be traced by the miner through the surrounding rock." I conceive that the court assumes such was the case here, and yet the evidence discloses without conflict as to the required geological facts that no vein or fractures of any kind could be followed on its strike in the 44 foot level from the raise, through the surrounding rock.

The third point with which I am concerned is that the trial court erred in finding there was an intersection of the vein in controversy with the Fitchburg vein on the 110 foot level, and that the veins again diverged. The court opinion here says that there was evidence to the effect that the two veins had distinct walls, meaning no doubt, distinct walls after the two veins junctioned (united). I believe, admitting this to be true, that a junction existed, because there was no evidence to show that the veins were separated by country rock. Defendants in error's witness Byron testified, when asked to define a junction, that it was when one vein joins with another vein and continues on as one vein between one set of walls. Defendants in error's witness Worcester, would not state definitely as to whether there was a junction or intersection of the vein in dispute with the Fitchburg vein, on the 110 foot level. He said he didn't think it was possible for anyone to make an absolute statement on that point. He said further, relative to a junction of the veins after they came together within one set of walls, that if a practical miner saw the vein at that point and knew nothing of the history of either vein, he would go ahead and mine it as one vein.

The trial court's finding that the line of intersection of the vein here in controversy with the Fitchburg vein con-

tinues in the 110 foot level a distance of 66 feet to the end line, established as a geological fact, that the two veins do not cross each other on their strike, but junction (unite) and continue from that point as one vein. In other words, the Fitchburg vein split on its strike, and the result of that split formed the vein in dispute. The evidence discloses conclusively that solid ground exists above the drift on the vein, between the 110 foot level and the surface, and that there are no workings whatever to show a separation of these veins above that level. The contrary of this condition appears in regard to the disclosure in the winze below the 110 foot level, as there is conclusive proof that there is no separation of the vein below this level. I think the finding of the trial court that the vein in dispute separated from the Fitchburg vein at some unknown point above the 110 foot level and continued upward to an alleged apex within the surface boundary of plaintiff's Gray Copper claim, is based solely upon "speculative conjecture." The court simply "took a look" into the solid ground above the 110 foot level and found that such separation took place. This we have said is not to be permitted. *Collins v. Bailey*, 22 Colo. App. 149, 164, 125 Pac. 543. The finding of the trial court on this question clearly shows that the court used the word intersection synonymously with the word junction, because, even if the disputed vein had dipped into the Fitchburg vein, above the 110 foot level, without cutting through that vein immediately below that level, then as a matter of law a junction (union) occurred. That is exactly what the evidence discloses. The court having found that the two veins united together between one set of walls and then continued together, both on the 110 foot level and in the winze, it should have found and decreed that a junction existed.

It is urged by defendants in error, and referred to in the court opinion, that the trial court "inspected" the territory involved in this controversy, which afforded it an opportunity to better understand the evidence, especially as relating to the physical aspects of the formation

and veins in conflict. I venture to assert that nothing could be presumed in favor of defendants in error, who were invading plaintiff in error's property. In *Zambakian v. Leson,* 79 Colo. 350, 246 Pac. 268, we emphasized the rule and said, at page 354: "The examination or inspection made by the court cannot have the effect of supplying additional evidence."

In conclusion, I emphasize three points in which mistakes or misconceptions of the legal effect of the evidence are made to appear It will make for clarity to keep constantly in view these three outstanding errors (false definitions) of the trial court as disclosed by the record, and approved by this court. These three points are, that the court in finding, first, that the vein in dispute apexed within the surface boundaries of defendants in error's Gray Copper claim, had virtually to define a barren fracture in the rock of the mountain as a vein; second, in finding that the footwall branches of the Fitchburg vein were mere "stringers" and not veins, and do not unite with the vein in dispute, the court had to hold in effect that a continuous body of ore does not constitute a vein; and, third, in finding that there was an intersection and not a union of the disputed vein with the Fitchburg vein on the 110 foot level, the court misconceived or misapplied the legal effect of the word "intersection." It is clear that the pronouncement of the trial court could not have been for defendants in error had any one of these points been resolved other than as I have set forth. This conclusion is irresistible, because if the first point had been resolved in the negative then the vein in dispute would belong to the owner of the senior Fitchburg claim as a matter of law, as an independent vein; if the second point had been resolved in the affirmative then the disputed vein would belong to the senior Fitchburg claim as a part of that vein, as a matter of law, irrespective of any other vein or veins, or where such veins apexed; and if the third point had been properly defined as a junction, then the vein in

302

controversy would belong to defendant as a matter of law, because defendant owns the senior Fitchburg claim.

I think the judgment should be reversed, with instructions to dismiss defendants in error's complaint, and to require them to account for ore taken, as prayed in plaintiff in error's cross complaint.